Davis, J.,
delivered tbe opinion of tbe court:
Tbe fourth section of tbe act of Congress, approved tbe 1st day of October, 1890, provided as follows :
“Tbat tbe said Shawnee Indians are hereby authorized and empowered to bring and begin a suit in law or equity against tbe United States Government in tbe Court of Claims to re *452 cover and collect from, tbe United States Government any amount of money that, in law or equity, is due from the United States to said tribes, in reimbursement of their tribal fund for money wrongfully diverted therefrom. The right of appeal, jurisdiction of the court, process, procedure, and proceedings in the suit here provided for, shall be as provided for in sections 1, 2, and 3 ctf this act.”
Upon the 6th day of July, 1892, an act “supplemehtary and amendatory” to the above act was approved by the President, which provided that the Shawnees “ shall present to the said court all their claims against the United States and the Cherokee Nation, or against either or both of them, of every description whatsoever, arising out of treaty relations with the United States, rights growing out of such treaty, and from contract expressed or implied, under such treaties, made and entered into by and between the said Shawnees and Cherokees, and between them, or either of them, and the United States.”
Pursuant to these acts the petition in this case was filed, and in accordance with their liberal provisions the trial has been conducted. Various items of claims have been presented, which will now be considered in their order.
In the year 1825, one branch of the Shawnee tribe resided in the State of Ohio, at Wapaghkonnetta and on Hog Creek; another branch resided near Cape Girardeau, Missouri. With the latter branch of the tribe a treaty was made by the United States in 1825 (7 Stat. L., 284), by which the Indians ceded to the United States their lands in Missouri, and in consideration the United States agreed to give to the “Shawnee tribe of Indians within the State of Missouri, for themselves and for those of the same nation now residing in Ohio, who may hereafter emigrate to the west of the Mississippi, a tract of land equal to 50 miles square situated west of the Missouri and within the purchase lately made from the Osages.” Further, as the tribe had improvements upon the ceded land and would be obliged to incur expenses in removal, it was stipulated that “for the purpose of rendering a fair equivalent for the losses and incoveniences which said tribe will sustain by removal, and to enable them to obtain supplies in their new settlements,” the United States should pay $14,000, of which $5,000 was to be furnished in domestic animals, implements of husbandry, and xirovisions.
It was further agreed in the same treaty that, as these In *453 dians bad various claims against tbe citizens of tbe United States for spoliation, wbicb they could not support by evidence of whites, $11,000 should be paid to tbe Shawnee Nation, to be distributed as they might deem equitable; it was further agreed that the United States should “ support and keep a blacksmith for their use on the lands .hereby assigned for the term of five years, or as long as the President may deem it advisable,” and that the United States should furnish the Shawnees the necessary blacksmith’s tools and 300 pounds of iron annually.
It appears that the Shawnees received payments under this treaty and that the Shawnees’ balance (upon these accounts) amounts to $1,152.78; with this sum the tribe will be credited. As there is no provision in the treaty for payment of interest on the moneys thus pledged to be paid, plaintiff is not entitled to the benefits of the act of April 1,1880 (21 Stat. L., 70), and interest can not be allowed by us.
Defendants endeavor to set off against this item of claim certain very considerable disbursements made by them for blacksmith’s pay. It appears that a blacksmith was supported by the United States for many more than five years, but the cost is not a proper charge against the Shawnees (under the treaty of 1825 or that of 1831), for discretion in this matter was entirely in the President. The treaty provided that the United States should support and keep a blacksmith for the term of five years, or as long as the President may deem it advisable.” This charge was to be entirely borne by defendants; the President had full discretion as to the duration of the employment, and his action bound the United States. A similar provision is contained in the treaty of 1831. No ’charge can be made against the Shawnees on this account.
The treaty of August, 1831 (7 Stat. L., 354), removed the Ohio Shawnees west'of the Mississippi and merged the two bands. By the first article of this treaty the Ohio Shawnees ceded to the United States their lands at Wapaghkonnetta and on Hog Oreek; in consideration of this cession the United States (article 2) agreed, first, to cause the band of Shawnees to be removed, in a convenient and suitable manner, to the western side of the Mississippi Eiver; second, to grant them by patent in fee simple a tract of land to contain 100,000 acres, to be located, under the direction of the President of the United *454 States, within the tract granted in 1825 to tbe Missouri Shawnees. It was further agreed in the same article that if there should not be sufficient “good land unoccupied by the Shawnee Indians who have already settled on the tract granted as aforesaid, * * * then the tract of 100,000 acres * * * shall be located * * * on lands contiguous to the said Shawnees of Missouri or on any other unappropriated lands” within a designated district. The United States (article 3) was further to defray the expense of removing the band, and there is no claim of failure in this regard. By article 4 the United States pledged themselves to build a sawmill and gristmill for the Shawnees upon the new land, to cause a blacksmith shop (to contain all the necessary tools) to be built for the Shawnees at their intended residence, and to employ a blacksmith “as long as the President thereof may deem proper.” The cost of these improvements was to be paid “out of the first sales to be made of the lands” ceded by the Shawnees to the United States.
The next article (5) provides :
“Article 5. In lieu of the improvements which have been made on the lands herein ceded, it is agreed that the United States shall advance to the said Shawnees (for the purpose of enabling them to erect houses and open farms at their intended residence) the sum of $13,000, to be reimbursed from the sales of the lands herein ceded by them to the United States. A fair and equitable distribution of this sum shall be made by the chiefs of the said Shawnees, with the consent of the people in general council assembled, to such individuals of their tribe who have made improvements on the lands herein ceded and may be properly entitled to the same.”
As to this, it is contended for the plaintiff that the transaction agreed upon resulted in no advantage to the Shawnees, because if the $13,000 be understood to be an advance merely, to be afterward reimbursed from the sale of the Ohio land, the United States would receive the improvements and also ultimately the $13,000 at which they were valued. It is not alleged that the $13,000 has not been paid.
Article 7 of the same treaty provides as follows:
“The United States will expose to public sale, to the highest bidder, in the manner of selling the public lands, the tracts of land herein ceded by the said Shawnees. And after deducting from the proceeds of such sale the sum of 70 cents per acre, exclusive of the cost of survey, the cost of the gristmill, saw *455 mill, and blacksmith shop, and the aforesaid sum of $13,000, to be advanced in lieu of improvements, it is agreed that any balance which may remain of the avails of the lands after sales, as aforesaid, shall constitute a fund for the future necessities of said tribe, parties to this compact, on which the United States agree to pay to the chiefs, for the use and general benefit of their people, annually, 5 per centum on the amount of said balance, as an annuity, said fund to be continued during the pleasure of Congress, unless the chiefs of the said tribe or band, by and with the consent of their people, in general council assembled, should desire that the fund thus to be created should be dissolved and paid over to them, in which case the President shall cause the same to be so paid, if in his discretion he shall believe the happiness and prosperity of said tribe would be promoted thereby.”
Article 13 provides (.at the request of the chiefs) that the price of an average section of the land ceded should be reserved by the G-overnment to be paid “the Shawnees who now reside on the river Huron, in the Territory of Michigan, for the purpose of bearing their expenses should they ever wish to follow” the Ohio Shawnees “to their new residence west of the Mississippi.”
As to article 7, it will be noted that the United States were to expose the lands first “ to publie sale to the highest bidder,” and, second, that this sale was to be made “in the manner of selling the publie land.” The manner of selling the public land in the territory “northwest of the river Ohio and above the mouth of Kentucky Elver” was thus prescribed in section 4 of the Act of May 18, 1796 (Stat. L., Vol. 1, p. 467): “Provided always that no part of the lands directed by this act to be offered for sale shall be sold for less than $2 per acre.” This direction was emphasized by the Act of May 10,1800 (Stat. L., Vol. 2, p. 73), which, in section 5, provided “that no lands shall be sold by virtue of this act at either public or private sale for less than $2 per acre, and payment may be made for the same by all purchasers either in specie or in evidence of the public debt of the United States.”
At the date of the treaty, then, it was provided by statute that no land in this section of the country should be sold for less than $2 per acre, and when the negotiators of this treaty placed in it the direction that the sale of the Shawnee lands was to be made “in the manner of selling the public lands” they must be understood to have had in their minds the man *456 date of the Congress of the United States. If there were any doubt upon this point it would be solved by the Act of July 14, 1832 (Stat. L., Vol. 4, p. 601), which expressly provided that the lands now in question be made part of the land districts in which they were situated, “ and liable to be sold as other public lands in the State of Ohio.” It appears, however, that only a small portion of the Shawnee land ceded by this treaty of 1831 was in fact sold at public sale. This land brought $2.08| per acre. All the rest of the Indians’ land was sold at private sale at $1.25 an acre. The reason for this course has not been disclosed to us.
We construe the treaty of 1831 to mean that the Shawnees surrendered absolutely to the United States their lands in Ohio. In return for this cession they were to receive: Land west of the Mississippi, the expenses of removal, an advance to pay for the sawmill and gristmill provided by article 4, the price of their lands in Ohio when these land were sold “at public sale to the highest bidder, in the manner of selling the public lands;” an advance of $13,000, the amount which article 5 directed should be advanced to the Indians “for the purpose of enabling them to erect houses and open farms at their intended residence,” and which sum it was also directed in the same article should be “reimbursed from the sales of the lands” conveyed by them. The United States were to retain, as directed by article 7, 70 cents per acre, exclusive of certain expenses in that article set forth specifically. A reservation was also made for the Huron Shawnees. The balance produced by this somewhat complicated account was to be held as a fund upon which 5 per cent per annum should be paid the tribe unless under certain contingencies the funds were paid over to the Indians.
The United States failed in their duty when they sold any of these lands otherwise than at public sale to the highest bidder in the manner of selling the public land, and as trustees of these Indians and their guardians, are liable to them for any loss which the Shawnees may have thus sustained. The best evidence which we have of the amount which these lands would have produced if sold according to the treaty stipulations is contained in the statutes above cited, and is, therefore, fixed by us at $2 per acre. True, the small amount of land belonging to the Shawnees actually sold at public sale brought a *457 somewhat larger price, and some of the land sold at $1.25 per acre bad upon it improvements; but most of the land at this rate was unimproved. We therefore believe that the statutory price of $2 was substantially a fair valuation. Upon this branch of the case the account may be thus stated: The Shawnees will be credited with the amount received at’ the public sale of the land sold at $2.08f per acre. They will be credited with $2 per acre for the rest of their land in the State of Ohio ceded by the treaty of 1831, as shown below. They will be debited with the amount actually received by them for the sale of these lands, with the items provided by article 4, with the sum of $13,000 prescribed in article 5, with the sum of 70 cents per acre retained by the United States, aud the cost of surveying.
As the balance thus produced should have gone to the fund provided in the (seventh) article “for the future necessities of the tribe,” interest at 5 per centum will be allowed upon it from the 30th day of June, 1840, the date of the last sale, the lands having been sold with reasonable expedition.
This computation allows to the Indians credit, upon the theory stated, for the entire amount of lands in Ohio ceded by them to the United States; it is, therefore, unneccessary to pursue the inquiry as to the fate of the school land, some 2,300 acres (it is said) alleged to have been diverted to school purposes under the Acts of April, 1802 (2 Stat. L., p. 103, sec. 7), and March 3, 1803 (2 Stat. L., p. 225).
Section 13 of the treaty of 1831 also provides, “at the request of the chiefs,” that “the price of an average section of the lands herein ceded shall be reserved in the hands of the Government, to be paid to their friends, the Shawnees, who now reside on the river Huron, in the Territory of Michigan, for the purpose of bearing their expenses should they ever wish to follow” the Ohio band. It is not shown that this fund has been misapplied, or that the Michigan Shawnees have declined to move West. As far as we are informed the money is held for the contingency contemplated by the thirteenth article, and therefore at this time the Western band have no claim to it.
The United States were unable to comply with their promise of 100,000 acres of land West, as contained in the second clause, and in the act of March 3, 1853, appropriated some *458 sixty-six thousand and more dollars to pay Indian claims thus arising. It is sought to connect this arrangement with the sale of the Ohio lands, but we deem it an entirely distinct transaction. The treaty of 1831 contained a complete bargain, by which the Indians surrendered their Ohio lands, for which they were to be paid $2 per acre less 70 cents retained by the United "States and certain charges above enumerated$ they were also to be paid 100,000 acres of land in the West. This last important element in the contract was not carried out by the defendants, and for that reason the Shawnees were paid the sixty thousand and odd dollars set forth in the findings.
This payment can not be held to be a refunding of the 70 cents deducted from the price of the Ohio lands, but as compensation for the failure of the United States to fulfill a treaty obligation created in 1831. The appropriating statute adopts this view when it says (10 Stat. L., 236): “For payment in full of all claims under that part of the treaty of eighteen hundred and thirty-one which has relation to the grant of one hundred thousand acres of land, in fee simple, to the then Ohio Shawnees, sixty-six thousand two hundred and forty-six dollars and twenty-three cents.” The statute required that receipt for this money should specify that “ it is in full satisfaction of such claim,” and such receipts were given. The transaction, therefore, is complete; the Indians did not receive the Western lands promised, and the United States have paid for their failure in this regard. It does not appear that the payment was insufficient.
It is further alleged on behalf of plaintiff that under the treaty of 1854 the Shawnees (both bands being now united) ceded their lands to the United States and as “part consideration” therefor received 200,000 acres in the State of Kansas, the Government farther agreeing .to pay the sum of $829,000 in the manner following : $40,000 to be invested by defendants at not less than 5 per centum interest per annum; $700-000 to be paid in annual installments ; $89,000 to be a final payment. In substance it is further alleged that the terms of the treaty have been complied with, except that the Government has kept back $22,000; this sum, together with $10,000 appropriated by an act of Congress passed in 1884, it is sought to recover here (paragraph 10 of petition). This claim is based *459 upon certain failures to pay or a dishonesty in payment to orphan Indians of their share under the allotments. •
Article 8 of the treaty of 1854 provides that “competent” Shawnees “shall receive their portions of the annual installments in money;” that the portion of “incompetent” Shawnees “shall be disposed of by the President in the manner deemed by him best calculated to promote their interests and the comforts of their families, the Shawnee council being first consulted with respect to such persons whom it is expected they will designate to their agent.” This section closes with the following clause, out of which this branch of the contention springs : “The portions of orphan children shall be appropriated by the President in the manner deemed by him best for their interests.”
It will be noted immediately that this section places upon the President a different responsibility in regard to the “incompetents” than in regard to the “orphans;” as to the former he must consult the Shawnee council, as to the latter he has absolute power and single responsibility. Some of this “orphans” money was paid to adult Indians, constituted by the Shawnee council guardians of the orphans; that is, to adult Shawnees purporting to be invested with power from the tribe to receive the infants’ money; much money thus paid never reached its proper destination, whether through carelessness or fraud on the part of the so-called “guardians” does not appear. Other moneys intrusted to an officer of the Indian Bureau bearing the title of superintendent was misapplied and lost. All the money thus lost to individual orphan minors through no fault of theirs it is sought in this action to turn into the fund of the Shawnee tribe.
The argument upon this point, especially as to the facts, seems to us to have been confused by considerations, which, in our opinion, are not important. What the exact course was of the Indian so-called “guardians” or the superintendent, or whether fraud or whether laches occasioned the loss, or how much was lost to the orphans through the “ guardians” or how much through the superintendent, we deem not to be of consequence at this time. The question is not between five parties, the United States, the guardians, the superintendent, the orphans, and the tribe; but between two, the United States and the orphans. The President was bound by section *460 8 to appropriate tbe portions of orphan children in the manner deemed by him best for their interests. His alone was the duty, power, and responsibility of caring for the money which there is no question belonged to these infant wards of the nation. The United States owed this money to the minors: there is no dispute as to this. The United States have not paid it; that is not denied. Whether the superintendent or the alleged Indian guardians stole it or lost it is not a question at issue, for a guardian can not excuse a breach of trust because of the employment by him of an incompetent or dishonest agent. The orphan Indians’ rights, to their shares of the fund was as perfect as the rights of the adults; but properly those rights were subjected to the guardianship of the United States, which through the employment of dishonest or incompetent agents lost their wards’ property.
The Shawnee tribe, as a tribe, have no claim to this money; it belongs to the individual orphan children, and to them should be paid. Under the treaty of 1854 the sum of $40,000' alone was reserved as a fund (article 3), while the annual installments were to bepaid proportionately to individual Indians, with the exception that the portion of orphans should be appropriated by the President in the manner deemed by him best for their interests.” The President deemed an allotment in severalty “best for their interests,” and this decision is final. In an endeavor to carry out this decision loss occurred through no fault of the children, but entirely through the laches or misconduct of agents selected by the United States. These facts can not be held to divest the orphans of their title to the stolen or lost money and to transfer this title to their tribe. Article 10 does not aid plaintiff in "his contention that the tribal fund should be credited with the orphan portions, for that article 'forbids the United States to pay Shawnee debts with the money due under the treaty, and the orphans’ share in this money was and is no more a “ debt contracted by the Shawnees” than the portion paid to adult Indians.
The “ orphan children ” are entitled to receive as individuals from the United States the portion due them under the treaty of 1854 not already paid. In case any have died the money will go to the personal representatives according to the local law.
Congress in 1884 passed an act (Stat. L., Vol. 23, p. 247) ap *461 propriating $9,437.62 toward paying tbe amount thus lost, but the executive officers of the G-overnment have refused to pay over the money. • This sum was directed by the statute to be paid to the Shawnees as a tribe; this the Secretary of the Interior and Commissioner of Indian Affairs failed to do, as they deemed that at least a part of the appropriation should be paid direct to the orphans, “the parties to whom it belonged.’’ The. amount thus lost to them we find to be $10,506.39.
In calculating interest we have not followed the strict rule of the common law in relation to promissory notes, as, in our opinion, the result would be inequitable to defendants.
A decree is now filed; judgment will be entered in accordance therewith.
The following decree was thereupon entered:
The Shawnee Indians, by Johnson Blackfeather, their principal chief, having, in accordance with the acts of October 1, 1890, and July 6,1892, presented to the Court of Claims in this action their claims against the United States, founded upon the treaties between said Indians and the United States made in the years 1825,1831, and 1854, the said Indians being represented in this court by Charles Brownell, esq., their attorney and counsel; and the Attorney-General having designated and appointed from the Department of Justice John C. Chaney, esq., a counselor at law competent to defend the United States; and the cause having been brought to a hearing before this court, now, upon the pleadings, evidence, ’ briefs, and arguments of counsel, the said court doth order, adjudge, and decree that there is due said Shawnee Indians from the United States this 12th day of June, 1893, principal and interest, the sum of $262,152.02, and judgment is now entered herein in favor of said Shawnee tribe and against the defendants for this amount.
Further, there is due the infant Shawnees, described in the findings of fact and opinion filed in this case, the sum of $10,-506.39, which it is further ordered, adjudged, and decreed shall be paid to said orphans or their personal representatives under the direction of the honorable the Secretary of the Interior.
It is further ordered, adjudged, and decreed in accordance with the provisions of said act of October 1,1890, that there shall be paid to said Charles Brownell, attorney and counsel for said Shawnee Indians, as his compensation, the sum of *462 $16,080, wbicb does not exceed 10 per centum of the amount recovered by said Indians and which is to be paid out of and deducted from the. said first above-mentioned sum of $262,-152.02.