JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.

## ALCEA BAND OF TILLAMOOKS et al. v. UNITED STATES.

### No. 45230.

United States Court of Claims.

Jan. 3, 1950.

Everett Sanders, Washington, D. C., and L. A. Gravelle, Washington D. C. (John G. Mullen, North Bend, Or., E. L. Crawford, Salem, Or., Edward F. Howrey and Douglas Whitlock, Washington, D. C., on the brief), for plaintiffs.

Clifford R. Stearns, Portland, Or., with whom was A. Devitt Vanech, Asst. Atty. Gen., for defendant.

LITTLETON, Judge.

This suit was originally brought by plaintiffs and seven other Indian tribes under clause .(b) of section 1 of the Act of August 26, 1935, 49 Stat. 801, which gave this court jurisdiction to hear and determine all claims arising under or growing out of the original Indian title, claim, or rights in, to, or upon lands occupied by Indian tribes and bands described in the unratified treaty of August 11, 1855, published in Senate Executive Document No. 25, Fifty-third Congress, first session, p. 815. In a decision dated April 2, 1945, 59 F.Supp. 934, 103 Ct.Cl. 494, and affirmed by the Supreme Court, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29, we held that four of the tribes, the Tillamooks, Coquille, Too-too-to-ney, and Chetco, had identified themselves as entitled to sue under the jurisdictional act; that they had proved their original Indian title to certain described lands; that the four tribes had proved an involuntary and

uncompensated taking of these lands, and that original Indian title was an interest, the taking of which without plaintiffs' consent was compensable.

A further hearing has been held and the case is now before us for determination of the amount of compensation to which the four plaintiff tribes are entitled under the Fifth Amendment, measured by the value of the lands taken on November 9, 1855, plus an additional amount measured by a reasonable rate of interest to make just compensation. From this must be offset amounts expended by the Government as gratuities on behalf of the four tribes, and an amount representing the value on November 9, 1855, of their interests in the land comprising the reservation allotted to the four tribes.

The boundaries of the lands exclusively occupied by the four tribes are set out in findings 8, 9, and 10 of the findings in our prior decision, and are incorporated herein by reference. The acreage of the lands of the four tribes embraced in such boundaries and taken by defendant on November 9, 1855, is as follows:

| | Acres |
| --- | --- |
| Tillamooks | 1,152,410 |
| Coquille | 722,530 |
| Too-too-to-ney | 464,490 |
| Chetco | 433,150 |
| Total acreage | 2,772,580 |

Plaintiffs contend that the value as of November 9, 1855, of the 2,772,580 acres of land of the four tribes is as follows:

| Tribe | Acres | Value per acre | Total value |
| --- | --- | --- | --- |
| Tillamooks | 1,152,410 | $2.67 | $3,075,975.25 |
| Coquille | 722,530 | 7.03 | 5,078,182.00 |
| Too-too-to-ney | 464,490 | 3.33 | 1,547,865.00 |
| Chetco | 433,150 | 2.30 | 996,908.50 |
| All lands | 2,772,580 | 3.86 | 10,698,830.75 |

Plaintiffs also contend that interest at the rate of 5% per annum should be added as part of just compensation. Plaintiffs concede that from the value of their lands must be deducted the value of their interests, as of November 9, 1855, in the lands comprising the reservation alloted to them and located on the Tillamooks' tribal lands. Plaintiffs also agreed that from any amount determined to be due them there should be offset any payments made to them by the United States, including gratuities.

The defendant contends that the four tribes named as plaintiffs are not identifiable groups of Indians in existence, in Oregon, at the present time; that the land taken had a market value in 1855 of approximately 9 cents per acre; that set-offs for gratuitous expenditures should be proportioned annually according to the amount spent in each year since 1855 before calculating the additional amount, measured by interest, for that year in order to make just compensation; and that a fair rate of interest to make just compensation is 4 percent.

The record in the earlier case, 59 F.Supp. 934, 103 Ct.Cl. 494, showed that in 1855 and thereafter there were considerable numbers of Indians comprising the four plaintiff tribes, and we held that those four tribes had sufficiently identified themselves as entitled to sue under the jurisdictional act. That decision was affirmed by the Supreme Court, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29. The exact number of the descendants of those four tribes in existence today, and who will be entitled to share in any recovery, is not properly a matter for judicial decision at this time but is rather an administrative concern of the Government in the later making of a roll of the four tribes.

The principal question now before us is the determination of the value on November 9, 1855, of the more than two million acres of land belonging to plaintiffs. In support of their respective contentions concerning that value, the parties have introduced considerable testimony of expert witnesses, and much documentary evidence consisting of ancient documents, Govern-

ment reports, both state and federal, maps and histories. From this material we have made findings of fact which we will not repeat in detail except where necessary. The various elements of value which both defendant and plaintiffs have offered for consideration relate to circumstances existing in the area for a period of approximately 28 years, from 1850 to 1878, and include the following: (1) the location of the lands and their physical characteristics; (2) the history of the Oregon Territory; (3) the development of Oregon generally and of the tribal lands in particular up to 1855; (4) disposal of the tribal lands by the Government under the various federal laws relating to the disposal of public lands in Oregon; (5) private sales of lands in the tribal area; (6) sales of lands in the tribal area by the Oregon & California Railroad; (7) natural resources in the tribal lands and their development between 1850 and 1878, that is, timber, minerals (gold and coal particularly), and agriculture; (8) commerce.

From the above summarized classes of evidence the parties have reached widely divergent conclusions respecting the value of plaintiffs' lands. Defendant contends that there was a market for the tribal lands in 1855 and the lack of actual sales of such lands indicates that there was no demand for the lands at the price asked pursuant to the various land laws under which public land could be acquired. Defendant urges that this condition persisted through 1878 and that only a very small percentage of the land in the tribal area was disposed of by any means. Plaintiffs, on the other hand, contend that the evidence shows the land to have been eagerly sought after from 1850 on, and that by 1878 nearly all the land available for disposition to the public in the tribal area had been disposed of. We shall not take up in detail the numerous contentions of the parties but shall summarize the facts on which they base their contentions and as a result of which facts we have arrived at certain conclusions.

The tribal lands in suit are located along the coast of Oregon bordering on the Pacific Ocean and comprise slightly more than half the state's coastal frontage, extending from the State of Washington on the north to the State of California on the south. The most northerly of these lands is that of the Tillamooks embracing the southernmost part of Tillamook County, nearly all of Lincoln County, and, on their eastern boundaries, small parts of Yamhill, Polk, and Benton Counties. The Pacific Ocean is the western boundary and the summit of the Coast Range of mountains the eastern boundary.

Immediately south of the Tillamooks' lands, for a distance of approximately sixty air miles along the Pacific coast, are located lands not involved in this proceeding, at which southern point the lands of the Coquilles begin. The Pacific Ocean forms the western boundary of the Coquille lands which extend eastward to the summit of the Coast Range of mountains in western Douglas County. They also include the greater part of the southern half of Coos County and part of the western portion of Douglas County.

Immediately adjoining the southern boundary of the Coquille lands, are the Too-too-to-ney lands, and adjoining these lands on the south are the lands of the Chetcos. The western boundary of both lands is the Pacific Ocean and the lands lie largely within the limits of Curry County. The southern boundary of the Chetco lands is the State of California. The eastern boundary of the lands of the two tribes is in general the western boundary of Josephine County.

All of the tribal lands are in what is known as the Douglas-fir region which includes those parts of Oregon and Washington west of the Cascade Range of mountains. The greater part of the lands is covered by forests of valuable timber. The soil is generally very fertile and well adapted to the growing of farm crops, fruits and vegetables, and to grazing. Many streams of sizes varying from those of substantial navigability to small streams useful for watering purposes are found in the tribal areas. The Coast Range of mountains forming the eastern boundary of the

lands is of relatively low elevation, particularly on the eastern boundary of the Tillamook lands where elevations are as low as 700 to 800 feet. They are more rugged and higher in the southern areas where elevations of 3,000 to 4,000 feet are found in the Chetco area. The tribal lands are generally more mountainous and rolling in the Too-too-to-ney and Chetco areas. The best agricultural lands are in the river valleys, though when cleared, most of the land is adapted to agriculture and to grazing pursuits. The climate in the area is mild and does not have the extreme temperatures of heat and cold which are found at the same latitude on the Atlantic Coast.

The western part of Oregon was largely explored early in the nineteenth century. Prior to that time the land was occupied exclusively by Indians. The earliest settlements were made by hunters and trappers of the Hudson Bay Company who established trading posts along the northern coast of Oregon and in the present State of Washington, gradually extending into various parts of both states. These people were not interested in permanent settlements but their activities did establish the beginnings of the later trade and commerce of Oregon in the fur, fish and lumber industries.

From 1800 to 1846 conflicting claims existed for the present States of Oregon and Washington by England, Russia, Spain, and the United States, based on discovery and exploration. In June 1846 these conflicting claims were resolved in favor of the United States when the present international boundary between the United States and Canada was fixed by the Treaty of June 15, 1846, 9 Stat. 869. Prior to that time, there was, of necessity, great uncertainty and indefiniteness of ownership of land on the part of settlers coming into the area. In spite of this condition, settlers were coming into the area and as early as July 5, 1843, they set up a Provisional Government for the Oregon Territory which then included both of the present States of Oregon and Washington. By the Act of August 14, 1848, 9 Stat. 323, Congress created the Territory of Oregon including both the present States of Washington and Oregon. In 1853 the Territory of Washington was detached from Oregon and on February 14, 1859, Oregon was admitted to the Union as a state, 11 Stat. 383.

Because of the mild climate, fertile soil, and many natural resources in the area, glowing reports were furnished by the early settlers and Indian agents to residents in other parts of the United States of the desirability of this section as a place in which to live. In 1838 a memorial was presented to Congress by the early settlers urging that American sovereignty be established over the area. As a result, settlers in numbers of consequence began to come into the area about 1838 and continued in large numbers as its advantages became better known, even though to reach the area it was necessary to travel a long distance by horse-drawn vehicles over unclaimed and frequently dangerous areas between the Mississippi Valley and the Pacific Coast.

The first census of the Territoy of Oregon (which included the present State of Washington) in 1850 showed a population of 13,294. By 1860 the population of Oregon (then a state and separate from Washington) was 52,465. In 1860 the Territory of Washington had a population of only 11,594. In 1850, Benton County, which at that time comprised substantially all of the area of the Too-too-to-ney, Coquille and Chetco lands in addition to other lands along the coast, and which was not technically open to settlement as far as the tribal lands were concerned, had a white population of 814. Other population figures will be found in finding 5.

### Development of tribal lands up to November 8, 1855

Technically, the tribal lands were not open to settlement until the Indian title was extinguished in November 1855, and no Government surveys had been made up to that time. In spite of that fact, however, there were some white settlements on these lands although the rights of the settlers in the land were little more than those of squatters or trespassers. Anyone

settling on that land gambled that the Indian title would be extinguished, that a Government survey of his land would be made, that the particular land would not be withdrawn by the Government for some public purpose, and finally that a patent would issue to him. Ordinarily, surveys of the public lands are made by the Government well in advance of actual settlement. In Oregon generally, settlement began sometime prior to the Treaty of June 15, 1846, and continued without benefit of surveys until 1851. When the Government was finally in a position to begin its surveys in 1851, no orderly procedure could be followed because it was necessary to survey first the land already settled so that title claims might be composed and records made for the protection of settlers. This resulted in a hit-and-miss method of surveying in small, scattered areas and the surveys proceeded at a very slow pace, preventing the offering of lands for settlement under the various land laws made applicable to Oregon.

The white settlements in the tribal lands prior to November 9, 1855, were mostly along the coast in the vicinity of harbors, on the open prairie lands and along the numerous streams which ran through the lands. There were harbor settlements at Bandon on the Coquille land, at the mouth of the Rogue River and at Port Orford on the Too-too-to-ney lands, and at Brookings on the Chetco lands. From these harbors, lumber and local agricultural produce, particularly wheat, were transported by ship to San Francisco where they found a ready market by reason of the large number of persons coming to California in the wake of the rich gold discoveries. Coos Bay Harbor, a few miles north of the Coquille lands, was fairly well-developed as a harbor by 1855 and was being used for the shipment of coal, lumber, and a great variety of local commodities, to San Francisco. It ultimately became one of the most important harbors in the world for the export of lumber.

The roads in the tribal area in 1855 were somewhat primitive, but were extended and improved as the population increased. The following rivers flowing through the tribal lands were used for transportation and for moving logs from the timbered areas to sawmills near the coast: the Nestucca, the Siletz and the Alcea, on the Tillamooks' tract; the Coquille on the Coquille tract; the Rogue on the Too-too-to-ney tract; the Pistol and the Chetco on the Chetco tract. The timber was manufactured into lumber and either transported by ship to San Francisco, or sold and used for the many purposes connected with the development and settlement of the area.

As early as 1852 the General Land Office recommended that the land grant policy of Congress be extended to include grants for the construction of a railroad in Oregon, and the Government, prior to November 9, 1855, made and published a survey for the location of a railroad along the western part of Oregon extending through a considerable portion of the tribal lands. The actual grant for the railroad was not made until 1866, but it followed in general the survey made prior to 1855.

## Methods of Acquiring Public Lands in Oregon from 1850 to 1878

Prior to the creation of the Oregon Territory in 1848, Oregon had no land laws and settlers could acquire no legal title to their lands but only a so-called right of occupancy. In response to frequent and numerous pleas from settlers and territorial officials, Congress enacted the Oregon Donation Act, 9 Stat. 496, on September 27, 1850. Originally this act provided for grants of 320 acres of land to single, and 640 acres to married, white settlers who were residents of the Territory prior to December 1, 1850. The act required that the settlers live on the land for four years, cultivate and improve it for their own use and not as agent for anyone else. Town lots, mineral lands, and lands reserved for public purposes, could not be selected for settlement. The donations were limited to one per person and no patent could issue to the settler until he had proved compliance with all the terms of the act and then not until the land had been surveyed by the Government surveyor. The Act provided for the appointment of a surveyor general for the Oregon Territory. Persons emi-

grating to Oregon after December 1, 1851, and before December 1, 1853, were entitled to only 160 acres if single, and 320 acres if married. All land so settled was subject to the Government's right to withdrawal for inclusion in some Government reservation.

On February 14, 1853, the Donation Act was amended, 10 Stat. 158, to permit a reduction of the four year occupancy requirement to two years upon the payment, however, of $1.25 per acre for the land settled. This amendment was apparently in response to reports to Congress from the General Land Office pointing out that Oregon had no land law whereby public lands could be secured simply by the payment of the usual price of $1.25 per acre, and recommending that the public land system allowing persons to buy public land at the minimum prices of $1.25 and $2.50 be extended to Oregon. On July 17, 1854, 10 Stat. 305, the Donation Act was amended to permit the purchase of donation land at $1.25 per acre after one year of occupancy. In this same amendment the Pre-emption Act of September 4, 1841, 5 ·Stat. 453, was extended to Oregon.

Under the Pre-emption Act, any person who did not own land in the territory and who was not the proprietor of 320 acres of land in any other state, might secure 160 acres of public land at $1.25 per acre provided the land was surveyed, the Indian title extinguished, actual settlement made with a dwelling erected, and the settler living on the land.

It was not until April 18, 1855, that lands in Oregon west of the Cascade Mountains were made subject to public sale and private entry as were other public lands of the United States. The Public Sale and Private Entry Act, as amended April 24, 1820, 3 Stat. 566, provided for the public sale of lands in 80-acre (half-quarter) sections to the highest bidder, but in no event for less than $1.25 per acre. At private sale, entire sections (640 acres) and less could be sold to the highest bidder above the minimum price of $1.25 per acre. No public or private sales of public lands could be made, however, until the lands had been surveyed and offered.

The Donation Act expired on December 1, 1855, 10 Stat. 158,. § 5, less than one month after the taking of plaintiffs' lands. Thus, at the time this area was first available for legitimate settlement, the only methods of acquisition open to new settlers were under the Public Sales and Private Entry Act, the Pre-emption Act, and by the location of military land bounty warrants (discussed more fully later in this opinion). At that time it was impossible to acquire land by any of these methods, however, until 1856 when surveys were finally begun in the tribal area.

Following the expiration of the Donation Act in 1855, it was not until 1863 that lands in this area could be acquired by settlement and improvement without the payment of at least the minimum price of $1.25 or $2.50 per acre. On May 20, 1862, Congress passed the Homestead Act, 12 Stat. 392, authorizing, after. January 1, 1863, free entry on 160 acres of public land which sold at the $1.25 per acre minimum price, or on 80 acres of the public land selling at the $2.50 per acre price. This act required five years actual occupancy, cultivation, and improvements. Any person claiming under this act who wished to secure his patent before the expiration of the full five-year period, could do so by the payment of the appropriate minimum price of $1.25 or $2.50 per acre.

Public land in this area, which had been surveyed and offered, could also be acquired by location of military land bounty warrants. The Act of February 11, 1847, 9 Stat. 125, provided that any honorably discharged, noncommissioned officer or private, who had served for a year or more in the armed services, was entitled to a warrant for 160 acres of the public land which might be located at any land office in the United States. No mineral lands could be selected. Eligible veterans had the option of receiving treasury scrip worth $100 and bearing interest at the rate of 6% per annum, redeemable at the pleasure of the Government. Veterans who had served less than 12 months were entitled to warrants for 40 acres of land, or interest-bearing scrip worth $25. The purpose of the act was two-fold, to induce men to enter

the armed services, and to encourage the settlement of public lands.

After 1868 [1] land in this area which had been surveyed and offered, could be acquired by the location of Agricultural College scrip. The Act of July 2, 1862, 12 Stat. 503, provided for the granting to each state of an amount of public land (exclusive of mineral land) equal to 30 thousand acres for each Senator and Representative in Congress. The grant was made for the purpose of aiding the agricultural colleges of the various states. In the case of those states which did not have sufficient public land subject to sale at private entry at $1.25 per acre to make up the required amount, the Secretary of the Interior was authorized to issue land scrip to the amount in acres for the deficiency of the state's distributive share. That scrip was then to be sold by that state and the proceeds applied to aid the state's agricultural colleges pursuant to the terms of the act. If the lands were selected from those public lands which had been raised to double the minimum price, or $2.50 per acre, in consequence of railroad grants, they were to be computed to the states at the maximum price and the number of acres proportionally diminished. The purchasers of the scrip could locate it on any unappropriated public land in the United States which had been surveyed and was subject to sale at private entry at $1.25 or $2.50 per acre. Not more than one million acres could be located in any one state. Before a state could claim the benefits of the act, it was necessary for that state to accept the act by appropriate legislation and it was not until 1868 that Oregon passed such legislation and the 90,000 acres of land to which Oregon was entitled was set aside. By that time, however, the act had been amended, Act July 27, 1868, 15 Stat. 227, to limit the amount of land that could be located in one body to three sections in any one township. Prior to that limitation it was possible for scrip owners to secure thousands of acres of land in one block and the large eastern lumber companies quickly bought up the scrip and located it on huge tracts of valuable timberlands in Michigan, Minnesota, and Wisconsin. By 1868, when Oregon had set aside its land subject to scrip entry, the amount of land obtainable in one block was greatly curtailed, and inasmuch as it was not economically sound in general to own small tracts of timberland, the Oregon timberland was not as desirable to the eastern lumber interests as had been the land in Michigan, Minnesota, and Wisconsin prior to 1868.

Most of the acreage involved in this suit consisted of valuable timberland, but it was not until 1878 that Congress authorized the sale of public timberlands in Oregon. The Timber and Stone Act of 1878, 20 Stat. 89, 43 U.S.C.A. § 311 et seq. permitted the sale of Oregon timberlands in quantities not exceeding 160 acres per person at a minimum price of $2.50 per acre.

From the above it can be seen that the acquisition of public land in Oregon was not very easy around the time of the taking of plaintiffs' lands primarily because of the lack of surveys and also because of the long periods of settlement required by the Donation Act and the Homestead Act if the land was to be acquired without the payment of the minimum prices. In spite of the slowness of the surveys and the withdrawal by the Government of huge tracts of lands in the tribal areas for various public purposes, the record of the actual disposal by the Government of public lands in this area up to 1875 indicates, contrary to defendant's contention, a lively demand for nearly all the land available.

### Disposal by Government of lands in the tribal area from 1855 to 1875

By the end of 1855 some 14,469 acres of the tribal land had been settled under the Oregon Donation Act which expired December 1, 1855, and patents eventually issued with respect to this acreage. It is not possible to tell from the evidence just how much of this land was patented after the required four years of residence on the land and without the payment of the mini-

---

[1]. Although the act was passed in 1862, Oregon did not enact the necessary legislation entitling it to the benefits of the act until 1868 and no land was designated for selection until that time.

mum price of $1.25, and how much was acquired by shorter periods of residence plus the payment of the minimum price. All of it was settled on with the mere hope that the Indian title would be extinguished.

According to an exhibit introduced in evidence by the defendant (Exhibit 8), 432,248 acres of the tribal land had been partially surveyed by 1875 but only some 103,073 acres had been offered for settlement or sale under the various laws governing the disposal of public lands applicable to this area. Of this acreage, 102,765, or all but 308 acres had been taken up by the public as follows:

| | Acres |
|---|---|
| Cash entries | 45,105 |
| Homesteads | 38,286 |
| Agricultural College scrip locations | 12,204 |
| Military land bounty warrant locations | 7,170 |

By 1875 over four hundred thousand acres of the tribal lands had been granted or withdrawn for various public purposes such as wagon road grants, railroad grants, school sections, and lighthouse reserves, and was not available to the public for purchase or settlement.

In the cash entry group (45,105 acres), the minimum price paid was either $1.25 or $2.50 per acre. This group also include the pre-emption entries where $1.25 was the fixed price, and sales under the Public Sale and Private Entry Act where the land went to the highest bidder, $1.25 being the lowest price paid. The record does not disclose those instances where more than the minimum price was paid.

Of the 38,286 acres settled under the Homestead Act after January 1863, any land patented to a settler who had not lived on the land for five years, was secured by the payment of $1.25 per acre or $2.50 per acre, depending on the land selected. The record indicates that title to some of this acreage was secured by such payments, but not the exact amount.

Of the 12,204 acres located by means of Agricultural College scrip after 1868 when Oregon accepted this act, it is impossible to tell from the record the prices paid for the scrip. Defendant alleges that the scrip of some eastern states sold at a discount (for less than $1.25) at various times but no evidence was offered to show that any scrip purchased for less than par value was located on the tribal lands. If any of the scrip located in Oregon was purchased at a discount, the price paid for such scrip would not be a fair indication of the market value of the land selected because, in addition to the price actually paid for the scrip, settlement under it involved the long and expensive journey to Oregon (Oregon issued no scrip since it had sufficient public land to make up its distributive share under the act).

Of the 7,170 acres settled under Military Land Bounty warrants, the actual cash value of such interest-bearing scrip which the veteran might elect to take instead of the warrant ($100 for 160 acres or approximately 62 cents per acre) is no indication of the value of the land selected. The purpose of the act was to promote the settlement of public lands and to induce men to enter the services. In order to accomplish the former, the Government necessarily offered as a bounty less value in cash (interest-bearing scrip redeemable at the pleasure of the Government), than the value of the lands so that people would elect to take the warrant and locate on the land rather than choose the scrip. Any veteran who elected to locate on land must have considered it worth more than the cash equivalent of his warrant. Many of the veterans undoubtedly came from the more thickly settled states in the east and had to expend large sums for travel and the expenses incident to settling on new land in order to locate their warrants on the tribal lands.

### Disposal of Oregon & California Railroad grant lands in tribal area

Pursuant to the Act of July 25, 1866, 14 Stat. 239, Congress authorized a grant of land to the California & Oregon Railroad Company to aid in the construction of a railroad from California to Portland, Ore-

gon. In 1870 and 1871, 186,100 acres of land in the tribal area were withdrawn by the Government from entry or sale for the purpose of this grant, and in 1871 the Railroad made selection of 8,761 acres from the land so withdrawn. The Act of June 25, 1866, was amended on April 10, 1869, 16 Stat. 47, to provide that the Railroad Company might sell the granted lands to actual settlers in quantities not greater than ¼ section (160 acres) per purchaser, and for a price not to exceed $2.50 per acre. The grantee violated the terms of its grant by selling to persons other than settlers, at prices in excess of $2.50 per acre, and in amounts exceeding the 160-acre limit.

The record in this case contains evidence of land sales by the grantee of approximately 71,866.26 acres of land in the tribal area, prior to 1907, at an average price per acre of approximately $4.23. A more detailed account of these sales will be found in finding 19.

Sales of land by settlers prior to 1875

The record contains evidence relative to sales of land in the tribal area by settlers (finding 20) in Coos, Tillamook, Curry and Lincoln counties. Twenty-four deeds in Coos County indicate the sale prior to 1864 of more than four thousand acres of land at an average price of $3.96 per acre. In Tillamook County prior to 1869, nearly six thousand acres were sold for an average price of $3.69. In Curry County, prior to 1868, some three thousand acres were sold for an average price per acre of $5.13. In Lincoln County between 1872 and 1874 over two thousand acres were sold for an average per acre price of $6.69. The record does not indicate the extent to which the lands so sold were improved. There is some indication in the record that the proper percentage of assessed valuation of land allocable to improvements was 9% (finding 32). This, of course, would not be true of town lots, but none of the sales considered herein included town lots.

The defendant has contended that only the very choicest of the tribal lands were selected for purchase or settlement and that therefore the prices paid for such lands are no indication of the value of the tribal lands as a whole. The only evidence on this point is contained in a report of the Commissioner of the General Land Office for November 30, 1853, and another report for 1858. Excerpts from these reports are set forth in findings 21 and 22. The 1853 report states that because settlers were social in their habits and wished to settle near churches, schools and towns, lands of all qualities were entered each year except for the most worthless type of lands which were disposed of by the Government in swamp-land grants. The report goes on to point out that in time, as the settlements increase and extend, lands comparatively poor become more valuable because of the general improvement of the neighborhood, so that the presence of sand and gravel on agricultural land might prove to be an asset to the owner because of the nearness of a town or village where such material was needed for building purposes.

From a consideration of the above summarized evidence in this case, we have reached the following conclusions: we agree with defendant that between 1855 and 1875 there was a market for lands in the tribal area. The extent of that market and the availability of lands for sale or settlement, however, was strictly within the control of the Government. This was so because of the necessity for Government survey of public land before it can be disposed of and because in the tribal area surveys proceeded at a very slow pace. Additional difficulties were imposed by the Government in that free entry under the Homestead Act required the long five years residence, and the laws permitting the acquisition of land by purchase without residence limited the amount of land that could be secured by any one person. In spite of these difficulties, by 1875 all but 308 acres of the tribal land which had been surveyed and offered to the public had been disposed of. Nearly two-thirds of such land was acquired by cash payments most of which payments were at least $1.25 per acre. The remaining third entered under the Homestead Act was

acquired either after five years of actual residence on the land and the making of extensive improvements, or by the payment of at least $1.25 per acre. The railroad grant lands in the area sold at an average price per acre of $4.23. Prior to 1855, over fourteen thousand acres of tribal land were settled under the Donation Act (expiring in 1855) although the land was not technically available for settlement under that act. At least some of that land was probably acquired by means of a period of actual residence plus the payment of $1.25 per acre. Considering the distances most prospective settlers had to travel to reach the tribal lands, the difficulties attendant on the acquisition of land in the area, the fact that mineral lands could not be purchased, that valuable timber land which comprised the vast amount of the acreage in the area could not be purchased as such until 1878, we conclude that the disposal of nearly all the land made available by the Government indicates a real and lively demand for the land and a conviction on the part of the public that this land was valuable. The land actually disposed of was, we believe, worth considerably more than the minimum price for public lands of $1.25 per acre, and if we were faced with valuing only that land, we would have no hesitancy in fixing a value somewhat in excess of that amount. However, the land available for disposal and actually disposed of comprises only a small portion of the total area of over two million acres involved, and it is therefore necessary to consider a number of other factors to aid us in determining the fair value of the land in the entire area.

## Timber

Most of the tribal land not available for disposal to the public prior to 1875 was covered with timber of excellent quality. Although in the early days of our colonial history our forests generally were considered inexhaustible and much waste was undoubtedly committed by settlers who considered the presence of timber a liability, business interests and the Government had, by 1850, come to a realization of the value of the nation's timber resources as distinguished from the value of the land itself. From a commercial standpoint the lumber industry had its beginnings in Maine and extended along the Atlantic seaboard. With the depletion of the larger supplies of timber in that area, operations were started in the region of the Great Lakes around 1850. By means of agricultural college scrip purchases prior to the 1868 limitation on the size of tracts, vast tracts of timber land in Michigan, Minnesota and Wisconsin were bought up by lumber companies and held for future operations. It was not until 1878 that timber and timber lands could be acquired other than under the homestead and preemption laws.

At the time of the settlement and development of the Oregon Territory, timber lands were generally known to be valuable and sawmills were constructed at various places in the Territory prior to 1855, at least one of which was in the tribal area at Port Orford. During the rapid development of San Francisco resulting from the gold rush, shipments of lumber were made from the Oregon coast and the prices obtained for such lumber in San Francisco were comparable to lumber prices in recent years. Because of the relatively small amounts of lumber involved in these sales, they are of little help in determining the value of the timber generally on the tribal land. They do indicate a recognition at this early date that the timber in the area was valuable.

The record contains the report of a forest survey made pursuant to the provisions of the McSweeney-McNary Forest Research Act of 1928, 16 U.S.C.A. § 581 et seq., in the Oregon and Washington region and which includes all the tribal lands.

Forest surveys were also made of the tribal lands in 1933, 1938, and 1942 showing the classification of the area on an acreage basis and the volume of timber of various types and classes. (See findings 25 for detailed tabulation.) The relationship of the six broad type classifications of timber

found on the four tracts at the time the survey was made was as follows:

| Type: | Percent of total area |
|---|---|
| Saw timber | 44 |
| Immature timber | 24 |
| Nonrestocked | 17 |
| Hardwoods | 5 |

Nonforest or barren......... 4
Agricultural ............... 6
Total ................. 100

 The following summary shows the timber volume on the tribal lands at the time of the foregoing forest survey:

*Trees 16 inches and more diameter at breast height* [1]

[Thousands of board feet, log scale, Scribner rule]

| Species | Data current as of— | | | | Total |
|---|---|---|---|---|---|
| | 1942 [2] Tillamooks | 1938 [3] Coquilles | 1933 Too-too-to-neys | 1933 Chetcos | |
| Douglas fir—old growth........... | 5,260,483 | 8,770,983 | 4,276,230 | 1,529,486 | 19,837,182 |
| Douglas fir—second growth....... | 8,190,618 | 3,571,832 | 545,555 | 437,159 | 12,745,164 |
| Sitka spruce ...................... | 942,180 | 1,373 | 32,157 | 8,543 | 984,253 |
| Hemlock and white fir........... | 2,478,615 | 673,096 | 175,739 | 54,320 | 3,381,770 |
| Port Orford cedar.................. | ............. | 487,520 | 352,841 | 2,867 | 843,228 |
| Western red cedar................. | 303,098 | 236,674 | 20,357 | ............. | 560,129 |
| Ponderosa pine, sugar pine, white pine and lodgepole pine......... | 3,833 | 72,872 | 3,938 | 44,374 | 125,017 |
| Tan oak ........................... | ............. | 3,567 | 182,723 | 195,654 | 381,944 |
| Myrtle and maple................. | 15,052 | 107,379 | 11,778 | 7,542 | 141,751 |
| Red alder .......................... | 234,155 | 95,227 | 12,109 | 2,010 | 343,501 |
| Redwood ........................... | ............. | ............. | ............. | 57,383 | 57,383 |
| Others ............................ | 88 | 76,592 | 4,634 | 2,515 | 83,829 |
| Total ...................... | 17,428,122 | 14,097,155 | 5,618,061 | 2,341,853 | 39,485,151 |

[1] Trees of hardwood species taken from 12 inches and more diameter at breast height.
[2] That part of the Tillamooks' lands lying in Polk and Benton Counties current as of the year 1940.
[3] That part of the Coquilles' lands lying in Douglas County current as of the year 1933.

Between 1855 and the dates of the forest surveys mentioned above, the stand and character of the timber on these lands were necessarily somewhat affected by such events as forest fires, logging operations, growth of trees, loss of trees through disease, storms, and the clearing of land for agriculture. We have found (finding 26) that based on the information contained in the surveys in evidence, and with full information of the timber history of these areas from 1855 to those dates, it would be possible for a man trained and experienced in forestry to reconstruct with a fair degree of accuracy the quantity and classifications of timber on these lands in 1855. The evidence both documentary and oral submitted is sufficient to support the conclusions that somewhat more saw timber was on these lands in 1855 than when the forest surveys were made; that the agricultural lands (shown to be 6% of the total area) were somewhat less in 1855, and that in general the acreage classifi-

cations by types were not substantially different at the two periods.

After a consideration of the above, we are unable to agree with defendant's contention that the growing timber on plaintiffs' lands had a negative value in 1855. The lumber industry in the United States in 1855 was an important industry and its future possibilities were generally appreciated by businessmen. The Government itself at that time must have been fearful that our forest reserves were being dissipated because from time to time it took various measures to guard against waste. It did not permit the sale of Oregon timberlands to any but settlers and then in small quantities; after the location of huge timber tracts in Michigan, Minnesota, and Wisconsin referred to above, it amended the Agricultural College Act to limit the size of the tracts that might be selected in the future, and it was not until 1878 that the Stone and Timber Act was passed permitting the purchase of timberlands as

such, and then only in quantities of 160 acres; from time to time the Government withdrew from the public lands available for disposition, large tracts of timberland for national forests. We are of the opinion that if the timberlands in the tribal area had been available and offered for sale at or around 1855 in tracts of sufficient size to attract the interest of lumber companies, much of this timberland would have been sold for at least as much as the agricultural land brought, and possibly more. Even under the restrictions imposed, a few saw-mills existed, lumber was manufactured and sold for substantial prices, and settlers found timber on their lands valuable for building and fencing purposes. Under the facts and circumstances established by the record in this case, we believe we are justified in considering the potential value of this timber, particularly since we are convinced the people generally knew that the lumber industry was a promising one and that the timber in Oregon was valuable. The timber on the several tracts of these tribes was commercially accessible.

### Mineral resources in the tribal area

For several years before the taking of the tribal lands, the public generally knew that the Oregon Territory was rich in various mineral deposits. As a result of the gold discoveries in California, the public was intensely interested in the subject of mineral discoveries and any new locations received immediate and widespread publicity. In 1851 the Secretary of the Interior provided funds for a geological reconnoissance and exploration of the Washington and Oregon territories and in 1853 Congress appropriated money to complete these reconnoissance. The *Columbian* (a newspaper published in Olympia) for January 22, 1853, published a communication from Dr. Evans, Government geologist in charge of the exploration, which report had been read before the House of Representatives in December 1852 when a resolution was pending relative to the continuation of the survey. The report indicated that limestone had been found in great quantities in the northern part of the territory, west of the Cascade Mountains in the Umpqua valley, and in the Willamette valley; that brown coal, or lignite, had been found on several tributaries of the Cowlitz and at Port Orford (on the Too-too-to-ney lands) and at various points from the Umpqua mountains to Puget Sound; that lead, iron, and copper had been found in some localities and were expected in others; that marl, clay, and gypsum were discovered near Port Orford and in the Cascade range; that gold mines in the Rogue River valley and in southern Oregon were being "wrought to considerable profit"; that the soil of Oregon was rich in minerals and that its use for agricultural purposes was unsurpassed. The Report of the Commissioner of the General Land Office, accompanying the Annual Report of the Secretary of the Interior for the year 1857, stated that Dr. Evans had reported rich deposits of semi-bituminous coal cropping out at various points from the British possessions to the boundary of California in an almost inexhaustible quantity and accessible to sail and steam navigation. While the reports were optimistic in some respects, valuable minerals of the kind mentioned were present in Oregon and their existence was known by those who came there to settle. In the various acts relating to the free entry and the sale of public lands for settlement described above, mineral lands were invariably excepted so that it was not possible to acquire mineral lands as such at the time of the taking and for many years thereafter.

The most important minerals known to be present in and around the tribal lands in 1855 were gold and coal. Shortly after the discovery of gold in California in 1848, gold discoveries were made in southern Oregon, including places in the Coquille, Chetco, and Too-too-to-ney areas. The mining was largely placer mining and the discoveries were not nearly as rich as those in California. However, a great deal of interest was created throughout the United States by these discoveries and many people came into the tribal area as a result of them.

There were no systematic annual reports of Oregon gold production by the Director

of the Mint until 1870. The official reported production of gold and silver in the Coquille, Too-too-to-ney and Chetco areas from 1870 to 1945 was as follows:

Coquille ..................... $553,697.38
Too-too-to-ney .............. 335,214.18
Chetco ..................... 204,004.11
_____
Total ................. 1,092,915.67

Expert witnesses for both plaintiffs and defendant were agreed that the gold and silver production between 1851 and 1870 was undoubtedly far greater than production after 1870 when the government began making production reports. The richest of the Oregon placer mines were those along the beaches of the Pacific coast in the tribal areas.

The discovery of gold in California and Oregon prior to 1855 greatly stimulated the settlement of the coastal area of Oregon. The greater increase in the California population gave to the residents of Oregon coastal area valuable markets for their products and gold as a circulating medium improved commercial dealings among the settlers.

Just prior to 1855 coal was discovered in the Coos Bay area some ten to fifteen miles north of the Coquille tract. By 1855 coal was being mined and sold from the Coos Bay area. Some evidence of the existence of substantial deposits of coal in the Coquille tract itself was known in 1855 but no actual mining had taken place on that tract at the time of the taking. By 1855 there was a good market for Oregon coal in San Francisco, where it sold for $20 per ton in small quantities and for from $16 to $18 per ton by the cargo. The harbors and rivers on the coast provided good transportation for coal found in the tribal areas and on adjacent lands. Many sloughs extended from the coast inland to the mine portals. The market for Oregon coal both in California and Oregon continued for many years until fuel oil gradually began to replace it in general use on the west coast.

In determining what part the presence of minerals in the tribal lands had in making up its value as of 1855, we have taken several matters into consideration. As stated above, the settlement acts applicable to this area excluded mineral lands from selection. It was not until after 1870 that mineral lands could be purchased as such. Pursuant to the Act of March 3, 1873, 17 Stat. 607, 30 U.S.C.A. § 71 et seq., public lands containing coal could be sold in maximum tracts of 160 acres to a person or 320 acres to an association of persons. The price for such land was to be not less than $10 per acre where the lands selected were situated more than 15 miles from a completed railroad, and not less than $20 per acre for lands which were within 15 miles of such a railroad. The record contains no evidence of specific sales of Oregon coal-bearing lands pursuant to this act. The record also contains no evidence of the costs applicable to the production of coal or gold in the tribal areas prior to 1875 or at the time of the taking in 1855 and therefore we have no basis for an accurate valuation of the mineral products themselves. However, we have no doubt that the known presence of these minerals and the fact of substantial production from 1851 on, added materially to the value of any land on which they were found and enhanced the value of adjacent lands. Considering these facts, and the prices fixed by the Government for mineral lands in 1873, we conclude that such mineral-bearing lands could not have been worth less, had they been available for purchase, in 1855 than were the agricultural and grazing lands which we have found were worth at least the minimum price of $1.25 per acre.

With respect to those lands in Oregon in 1855 which were under actual cultivation as agricultural lands, the United States Census reports for the year 1850 showed that there were 1,164 farms containing 432,803 acres of land assessed, with improvements, at an average value per acre of $6.58.

In 1860 the Census report showed 2,060,539 acres of farm land under cultivation in the State of Oregon having an assessed value per acre of $7.33. Improvements accounted for approximately 9% of the assessed value, this percentage being low

because improvements were on the whole modest and the materials for much of them could be found on the land itself. In some areas storage facilities for crops were unnecessary because the mildness of the winter made it possible to leave certain crops in the ground.

The production from the above-mentioned farms in 1850 and 1860, according to the United States Census reports, was as follows:

| | 1850 | 1860 |
|---|---|---|
| Wheat (bushels) | 211,943 | 912,995 |
| Oats (bushels) | 61,212 | 1,020,007 |
| Irish potatoes (bushels) | 91,326 | 466,913 |
| Butter (pounds) | 211,464 | 1,153,249 |

Farming in Oregon was profitable and comparatively easy. As early as 1839 Oregon wheat was purchased by the Hudson Bay Company and exported to the Russian settlements. From the first discovery of gold in California and for many years thereafter, Oregon products found a ready market at high prices. In January 1853, the *Columbian* listed retail prices for agricultural products that, in some instances, are not unlike the prices we are paying at the corner grocery store today, such as 75 cents per dozen for eggs and $1.00 per pound for butter. (For other prices see finding 32.)

In spite of the absence of railroads in Oregon in 1855, a substantial amount of trading was being carried on by ship from the harbors along the Oregon coast. In finding 34 we have reproduced an announcement appearing in the *Columbian* of January 22, 1853, of a firm of shipping agents, stating that a line of packets was trading regularly between Puget Sound and San Francisco for the transportation of cargoes of numerous lumber products for building and shipbuilding purposes, Oregon agricultural produce, fish, etc. The fish and fur trade started by the Hudson Bay Company many years prior to 1855 was flourishing at that time. Finding 34 contains a list of retail prices for other than agricultural products which offer an interesting comparison with present-day prices for the same products.

From these latter facts we conclude that the tribal area was not located in the midst of an unsettled wilderness whose development was far in the uncertain future. Thriving settlements existed in the adjacent areas, including California to the south. The character of the land and its potential worth were generally known to the public. There was not only a market but a demand for the lands. The Indians residing on the lands in question were of a quiet and peaceful nature and were actually engaged in some farming activities. In spite of Indian occupancy of these lands, some 14,000 acres were actually settled by white people prior to 1855 when the Indians were removed by the Government. This, of course, caused some armed conflict between the whites and certain of the Indians.

Defendant argues that the price paid by the Government to Indians under cession agreements for other land in Oregon at about this time is a good indication of the value of plaintiffs' land. Defendant refers particularly to a treaty of 1851 under which the Government paid $28,500 for approximately 2,500,000 acres of land in Oregon. We have dealt fully with this argument in other cases and have held that in general, treaties and cession agreements of the type referred to by defendant in this case are of no help in arriving at the fair net value of Indian lands, because such treaties were negotiated and obtained at an early date and the lands were secured for an amount which the Indians could be induced to take rather than for an amount based on what their property rights were really and fairly worth. Iowa Tribe of Indians v. United States, 68 Ct.Cl. 585; Blackfeet Nations .v. United States, 81 Ct.Cl. 101; Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States, 85 Ct.Cl. 331.

From the record as a whole, we conclude that the lands taken had an average value of at least $1.20 per acre on November 9, 1855, taking into consideration the proven demand for the land, the prices at which it was disposed of by the Government and by the settlers themselves, the mineral, agricultural and timber values above referred to, and not ignoring the fact that some of the land was undoubtedly of small value then and today, and also tak-

ing into consideration the reasonable costs of making all necessary surveys and supervising the disposition of such lands. Accordingly we hold that the value of each of the four tracts taken on November 9, 1855, was as follows:

| Name of tribe | Number of acres | Value per acre | Total value |
|---|---|---|---|
| Tillamooks .............................. | 1,152,410 | $1.20 | $1,382,892.00 |
| Coquille ............................... | 722,530 | 1.20 | 867,036.00 |
| Too-too-to-ney ......................... | 464,490 | 1.20 | 557,388.00 |
| Chetco ................................ | 433,150 | 1.20 | 519,780.00 |

■ Our prior decision in this matter, however, provided that the four tribes were not legally and equitably entitled to recover the entire value above set forth because those values must be offset as of November 9, 1855, by the values as of that date of their interests in the land comprising the reservation on August 15, 1894, of which interests the Indians of these tribes then became the beneficial owners through recognition by Congress on the basis of allotments in severalty which had been made, and on the basis of population as to unallotted lands or proceeds therefrom. The lands and their values to be offset for each of the tribes as of November 9, 1855, are as follows:

| Name of tribe | Allotted (acres) | Interest in unallotted land (acres) | Total (acres) | Value per acre | Total value |
|---|---|---|---|---|---|
| Tillamooks ........................ | 9,174 | 37,070 | 46,244 | $1.20 | $55,492.80 |
| Coquille .......................... | 3,299 | 13,239 | 16,538 | 1.20 | 19,845.60 |
| Too-too-to-ney ..................... | 15,240 | 61,562 | 76,802 | 1.20 | 92,162.40 |
| Chetco ........................... | 5,059 | 20,520 | 25,579 | 1.20 | 30,694.80 |

After deducting the above amounts and acreage, the remaining acreage and the amounts to which plaintiffs are entitled as compensation, are as follows:

| Tribe | Acres | Amounts |
|---|---|---|
| Tillamooks ...... | 1,106,166 | $1,327,399.20 |
| Coquille ........ | 705,992 | 847,190.40 |
| Too-too-to-ney ... | 387,688 | 465,225.60 |
| Chetco .......... | 407,571 | 489,085.20 |

■ We also held in the prior case that the defendant was entitled to have offset against the total of any judgments rendered for just compensation in favor of plaintiff tribes, amounts expended as gratuities on behalf of these tribes. Such gratuities to June 30, 1943, the end of the accounting evidence, were in the following amounts:

Tillamooks .................. $366,901.25
Coquille .................... 221,708.52
Too-too-to-ney ............. 144,444.34
Chetco ..................... 135,859.39

■ With respect to its right to offset gratuities, defendant contends that the setoffs should be proportioned annually according to the amount spent in each year since 1855 before calculating and adding the additional amount measured by interest for that year in order to make just compensation. What defendant is asking is that setoffs be allowed on a diminishing balance basis. This contention of defendant completely ignores the fact that the amounts so allowed as offsets are pure gratuities which would not be recoverable by the United States except by virtue of Section 2 of the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C.A. § 70a, which provides in part that "offsets * * * may [be] set off * * * against any *award* made to the claimant * * *." [Emphasis supplied.] Since these gratuities were not reimbursable items at the time they were made and since there was no obligation on the part of the Indians to repay such amounts, they cannot be held to have become due to the United States independent of the final determination of the sum due the Indians. In accordance with the established practice

in other cases we have determined the amounts due to plaintiffs and have then allowed the total amount of offset in accordance with the jurisdictional act and Section 2 of the Indian Claims Commission Act of 1946.

■■ Our former decision in this case provided that the compensation to the plaintiffs should be measured by the value of the land in 1855, plus an additional amount measured by a reasonable rate of interest to make just compensation. Defendant contends that 4% is a reasonable rate of interest to be applied in this case because the jurisdictional act under which the suit was brought provides that 4 per cent be paid on Indian funds on deposit in the Treasury and because that rate was provided for in the Menominee Jurisdictional Act of Sept. 3, 1935, 49 Stat. 1085. The jurisdictional act in this case is silent on the matter of what rate of interest shall be applied to the final award to make just compensation. The only mention of interest is in connection with the 4% interest which is to apply to funds of these plaintiffs after they are deposited in the Treasury of the United States to the credit of these Indians. The Government made a similar contention in Shoshone Tribe of Indians v. United States, 82 Ct.Cl. 23, reversed 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360; 85 Ct.Cl. 331, affirmed 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213, where the jurisdictional act contained an almost identical provision concerning the rate of interest to be applied to funds deposited in the Treasury, but was silent on the matter of the proper rate to apply to the judgment to make just compensation. In that case we found 5% to be a reasonable rate of interest to make just compensation. See also Klamath and Moadoc Tribes v. United States, 85 Ct.Cl. 451, affirmed 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219.. The Menominee Jurisdictional Act referred to by defendant is quite different from the jurisdictional act in this case in that it specifically provides for the rate of interest to be applied to the final determination of this court in order to make just compensation, 49 Stat. 1085,

1086. Where the jurisdictional act is specific on that point, the court will, of course, allow the rate so specified. In some cases this court has decreed that 5% is the proper rate to be applied to the final award on the basis of a treaty requirement binding the Government to pay 5% on Indian funds. Blackfeather v. United States, 28 Ct.Cl. 447, reversed 155 U.S. 180, 15 S.Ct. 64, 39 L.Ed. 114; Creek Nation v. United States, 78 Ct.Cl. 474. As pointed out by this court in the Shoshone case, supra, treaties, acts of Congress, and agreements, have nearly always provided for interest on funds held in trust by the Government for the benefit of Indians at a rate of 5% per annum. The field for investment by an Indian tribe, unlike that open to unrestricted citizens, is limited to a deposit in the Treasury of the United States and the payment on its money of interest at the usual rate of 5 percent. We have been offered no valid reason for departing from our prior practice of awarding interest at the rate of 5% in this type of case, which rate is the one that would have been applied to plaintiffs' funds had they been in existence and invested, as Indian funds must be, during most of the period involved in this suit. However, we take judicial notice of the fact that by 1934 economic conditions in this country were such that interest rates on large investments and on loans in large amounts were generally less than they had been previously. Accordingly, we find 5% to be a reasonable rate of interest to be used in determining the additional amount to be added to the final award to make just compensation from November 9, 1855 to November 9, 1934, and 4% to be a reasonable rate of interest to be used for such purpose thereafter. Plaintiffs are therefore entitled to an additional amount to be added to the fair value of their property rights in 1855 taken by the Government (less the value at that date of their interests in the land allotted to them) computed at the rate of 5% per annum from November 9, 1855 to November 9, 1934, and at the rate of 4% per annum from November 9, 1934 to the date of the judgment herein, January 3, 1950. The additional

amounts so measured to which plaintiffs are so entitled are as follows:

Tribe
Tillamooks ............... $6,047,778.24
Coquille .................. 3,859,893.60
Too-too-to-ney ............ 2,119,619.52
Chetco ................... 2,228,326.51

The total mounts due plaintiffs to date of judgment, January 3, 1950, are as follows:

Tribe
Tillamooks ............... $7,375,177.44
Coquille .................. 4,707,084.00
Too-too-to-ney ............ 2,584,845.12
Chetco ................... 2,717,411.71

From the above amounts determined to be due plaintiffs, the defendant is entitled to offset certain sums set forth in the findings and mentioned above, gratuitously expended by the Government for the benefit of plaintiff tribes. The deduction of these amounts from the amounts set forth above due plaintiffs, leaves the following amounts for which judgment will be entered in favor of plaintiffs:

Tribe
Tillamooks ............... $7,008,276.19
Coquille .................. 4,485,375.48
Too-too-to-ney ............ 2,440,400.78
Chetco ................... 2,581,552.32

In addition, plaintiffs are entitled to an additional amount as part of just compensation measured by interest at the rate of 4% per annum from the date of judgment, January 3, 1950, to the date of payment, on the following principal sums:

Tribe
Tillamooks ............... $1,327,399.20
Coquille .................. 847,190.40
Too-too-to-ney ............ 465,225.60
Chetco ................... 489,085.20

Judgments will be entered accordingly. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.