281 F.2d 202
 MIAMI TRIBE OF OKLAHOMA, also known as the Miami Tribe, and Harley T. Palmer, Frank C. Pooler and David Leonard, as Representatives of the Miami Tribe, and of All the Members Thereof, Appellants, Ira Sylvester Godfroy, et al., on Relation of the Miami Indian Tribe and Miami Tribe of Indiana, and Each on Behalf of Others Similarly Situated and on Behalf of the Miami Indian Tribe and Various Bands and Groups of Each of Them, Comprising the Miami Tribe and Nation, Appellants
v.
UNITED STATES, Appellee.
 Appeal No. 2-59.
 United States Court of Claims.
 July 15, 1960.
 
 COPYRIGHT MATERIAL OMITTED Edwin A. Rothschild, Chicago, Ill., for appellants Miami Tribe of Oklahoma and others. Edward P. Morse, Chicago, Ill., and Louis L. Rochmes, Washington, D. C., were on the brief.
 Walter H. Maloney, Washington, D. C., for appellants Ira Sylvester Godfroy and others. James N. Berry, Kansas City, Mo., on the brief.
 W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellee.
 MADDEN, Judge.
 
 
 1
 This is an appeal from a decision of the Indian Claims Commission (hereinafter called the Commission). The appellants, the Miami Tribe of Oklahoma (hereinafter called the Miami Tribe) and the Miami Tribe of Indiana (herein referred to as the Indiana Miami) filed claims under the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C. A. §§ 70-70v, to recover additional compensation for certain lands which the Miami ceded to the United States by the Treaty of June 5, 1854, 10 Stat. 1093. Under that treaty, the Miami ceded all of their land located on the eastern border of Kansas, with the exception of 70,640 acres. The consideration to be paid to the Miami Tribe was described as $200, 000, of which $50,000 was to be invested by the President of the United States for the benefit of the Miami Tribe, with the remainder to be paid to the Miami Tribe in twenty annual installments of $7,500, starting in 1860. No part of the consideration was to be paid to the Indiana Miami. The treaty also provided for commutation of tribal annuities which were payable to the Miami under earlier treaties. Payment for the commutation was to be made to both the Miami Tribe and the Indiana Miami.
 
 
 2
 The appellants claimed that the consideration they received in 1854 for their lands in Kansas and for the commutation of their annuities was unconscionable or inconsistent with fair and honorable dealings. They also claimed that they were entitled to be paid for more land in Kansas than they actually owned, since the United States had promised to give them more land than it did give them. Finally, they claimed interest on certain sums which they had been paid by the United States in 1891 to reimburse them for amounts which were rightfully theirs but which had been paid to other parties. The total amount claimed by the appellants was $1,092,799.28.
 
 
 3
 The Commission decided that neither appellant was entitled to relief, in an opinion rendered on July 14, 1958, reported at 6 Ind.Cl.Comm. 552. The Commission made findings of fact which are reported at 6 Ind.Cl.Comm. 513.
 
 
 4
 Prior to 1846, all of the Miami Indians lived in Indiana. In that year, pursuant to a treaty signed on November 28, 1840, 7 Stat. 582, a group of the Miami Indians moved to Kansas. The Miami Tribe are the descendants of those Miami who went to Kansas and remained there (and later moved to Oklahoma), while the Indiana Miami are the descendants of the Miami who remained in Indiana, or who went to Kansas but later returned to Indiana. An issue in the case is whether the Indiana Miami are entitled to participate in any recovery for inadequate consideration received for the Kansas lands ceded to the United States in 1854. It is agreed that the Indiana Miami will participate in any recovery for inadequacy of consideration paid for the 1854 commutation of annuities. It must first be determined, however, whether there is to be any recovery. The Indiana Miami join with the Miami Tribe on issues relative to liability.
 
 
 5
 The issues in this case are (1) whether the consideration paid by the United States for the Kansas land ceded to it in 1854 was so inadequate as to entitle the Miami to recover under section 2(3) or 2 (5) of the Indian Claims Commission Act, 25 U.S.C.A. §§ 70a(3) and (5); (2) whether the Miami were entitled in 1854 to be paid for 500,000 acres of Kansas land, rather than for the 324,796.88 acres which they actually owned, on the grounds that they had moved to Kansas on the understanding that the United States would give them 500,000 acres there; (3) whether the consideration paid for the commutation of certain annuities was inadequate; (4) whether the Miami are entitled to recover interest on sums which were paid to them in 1891 to replace allotments and payments which had been wrongfully made in 1858 and 1859 to spurious or unqualified Miami Indians; and (5) whether the Indiana Miami are entitled to share in recovery for the Kansas land.
 
 
 6
 The Commission found that the land ceded by the Miami on June 5, 1854, had a fair market value on that date of $1.25 per acre, or a total value of $317,697.93. It concluded that the Miami had received $200,000 therefor, and that this amount was "not an unconscionable consideration under the facts and circumstances surrounding its purchase on that date, and that petitioners are not entitled to relief under section 2(5) [the `fair and honorable dealings' section] of the Indian Claims Commission Act." 6 Ind.Cl. Comm. 551. The Commission further concluded that the consideration paid the Miami for the commutation of their annuities in 1854 was not unfair, dishonorable or unconscionable; that the Miami were not entitled to recover for the number of acres by which the acreage they actually received under the 1840 treaty was less than 500,000, the number of acres the Miami claim they had been promised; and that the Miami were not entitled to recover the interest they claimed on the funds which were misapplied in 1858 and 1859. It also held that the Indiana Miami had no interest in the Kansas land.
 
 
 7
 (1) The Adequacy of the Consideration Paid for the Kansas Lands Under the 1854 Treaty.
 
 
 8
 The Commission found that the Kansas lands were worth $1.25 per acre, $317,697.93 in total; the Miami claim they were worth not less than $2.40 per acre, $609,980 in total. The Commission concluded that the Miami received $200,000 for their lands; the Miami contend they received only $121,974.23. The Commission held that consideration of $200,000 for land worth $317,697.93 was not unconscionable; the Miami contend that since they received only $121,974.23 for land worth at least $609,980, they are entitled to recover $488,005.77, but they also argue that even if the Commission was correct about the values of the land and of the consideration, such consideration was unconscionable, or inconsistent with fair and honorable dealings.
 
 
 9
 In considering the controversy over the value of the land, it must be borne in mind that this court's jurisdiction on appeal is limited to determining
 
 
 10
 "whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting `fair and honorable dealings', where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact." 25 U.S. C.A. § 70s(b).
 
 
 11
 The requirement that the Commission's findings of fact be "supported by substantial evidence" means that they must be supported by evidence which is substantial when whatever in the record which fairly detracts from its weight is taken into account. Osage Nation of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592, 603-614, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672; Prairie Band of Potawatomi Indians v. United States, Appeal No. 2-57, decided July 16, 1958, 165 F.Supp. 139, 143 Ct. Cl. ___ (slip opinion, p. 21).
 
 
 12
 We think that, in this case, the Commission's finding as to the value of the land was supported by substantial evidence.
 
 
 13
 In 1856 the land was surveyed and classified as 13.3% Class I land (bottom, terrace and upland, with alluvial and dark residual prairie soil, having a slope of two percent or less), 65.7% Class II land (land with dark residual prairie soil over a clay subsoil, having slopes up to 12%), and 21% Class III land (land unsuited to agriculture, but which produces a good prairie hay). The tract as a whole had a 40% timber coverage of walnut, hickory, elm, sugar maple and other hardwoods on the uplands and sycamore along the streams. The coverage of the ceded lands was only 15%. The Osage River and its tributaries flow generally south and southeast through the tract. The principal use for this land appears to have been for small-scale farming.
 
 
 14
 Two expert witnesses testified on behalf of the Government. They based their opinions as to the value of the Kansas land primarily upon a comparison with a 350,000-acre tract of land in Missouri lying just to the east of the Miami lands, across the Kansas-Missouri border. The Government's expert Hall noted that similar and contiguous land in Missouri had been on the market, at $1.25 per acre, for years, but that it had not been sold. He derived a value of 35¢ per acre for the Kansas land, by taking into account deductions for advertising, delay in realizing upon investment, costs of financing transportation and other improvements, and similar items. The Government's witness Murray valued the Kansas land at 50¢ per acre. He found that the Kansas land was quite comparable to the Missouri tract, and noted that only 10% of the Missouri lands had been sold between 1843 and 1846, but that a sharp increase in sales occurred in 1853-1854. It appears that another 10% was sold in 1854, but that about 252,000 of the 350,000 acres, or 72% of the original Missouri tract, remained unsold in June 1854. It appears that there were 22,722,000 acres of unsold public lands in Missouri in June 1853, and that over 20,000,000 acres remained unsold in June 1854. Under the Pre-emption Act of 1841, 5 Stat. 453, settlers could enter upon 160-acre tracts of public lands and obtain preferential rights to buy the land at $1.25 per acre. Military scrip and warrants applicable to land purchases were made assignable in 1852. They were credited at $1.25 for an acre of selected land, but could be obtained in 1854 for about $1.10 each. Public land in Kansas was, in general, held off the market until after July 1, 1857, because, it appears, the general land market in the area was saturated.
 
 
 15
 The appellants object to the finding that the general land market was saturated. They say that the availability of land in Missouri did not "saturate" the land market of eastern Kansas, and cite our statement in Miami Tribe of Oklahoma v. United States, Appeal No. 2-58, decided July 13, 1959, Ct.Cl., 175 F. Supp. 926, slip opinion, p. 40, that material with respect to land available throughout the United States at the time of cession had no relevancy to the issue of value in that case. It is true that the amount of land available throughout the United States is irrelevant, but in this case we are concerned with evidence of the availability of large quantities of very similar land immediately adjoining the tract in question.
 
 
 16
 The Miami rely primarily upon a comparison between their Kansas lands and a 208,000-acre tract of land, lying immediately north of their own land, which was ceded by the Peoria and other Indians to the United States on May 30, 1854, 10 Stat. 1082. The Peoria tract was placed on the market in 1857, at an average appraisal of $1.66 per acre, and was completely sold within three weeks, for an average price of $1.67 per acre. The Miami argue that this price of $1.67 was considerably below the realistic market value of the land. They say the price was low because no competition was allowed, since most of the acreage was preempted by real or spurious settlers and their assignees. They point to the rapidity with which the land did sell, and to the average profits upon resale of at least 65¢ above appraisal.
 
 
 17
 There is, however, a significant difference between the Miami and the Peoria tracts which supports a conclusion that the Miami lands were worth less. The location of the Peoria tract was considerably more advantageous than that of the Miami tract, since it was nearer to Kansas City and Leavenworth, as well as to the Santa Fe Trail. At the time with which we are dealing here, such differences in location, even if they do not seem very great by our current standards of distance, could have had significant effect upon land value. As the appellants note, certain lands ceded by the Iowa and Delaware Indians were appraised at higher values than the Peoria lands, "presumably because of advantages arising from their proximity to the Missouri and Kansas Rivers, the only navigable waterways."
 
 
 18
 Further, the sales of the Peoria lands did not take place until 1857. While these sales were made only three years from the time of the Miami cession, this was a turbulent and significant period in the history of Kansas, and we cannot say that conditions in 1857 were sufficiently comparable to those in 1854 to require a finding that the 1857 sale of the Peoria lands determines their 1854 value. While the Commission would have been justified in placing more weight on the evidence of the market value of the Peoria lands, we cannot say that its failure to do so was erroneous.
 
 
 19
 The Miami also point to certain sales of preemption claims to land within the Miami tract itself which were made in 1857 for $5 to $7 per acre and to sales of nearby trust lands for the Iowa and Delaware tribes for an average of $2.35 per acre in 1857 and $2 in 1867. Again while we might have given more weight to these factors than did the Commission, we cannot say, in view of the differences in time and location, which may well have been quite significant, that the Commission erred in discounting their importance.
 
 
 20
 The appellants complain that the Commission erred by relying on the "wholesale theory" to value the Kansas land. We note that the Commission, in its opinion, indicated that it thought the valuation of the Miami land should take into consideration the value of the tract if it were to be sold as a whole, rather than the total of the values of such smaller tracts into which it might be divided. We have disapproved this "wholesale theory". Miami Tribe of Oklahoma v. United States, supra, 175 F.Supp. 926, 953, slip opinion pp. 43-44. It does not appear, however, that the Commission has based its finding of value in the case upon this theory.
 
 
 21
 We conclude, therefore, that the Commission's finding that the Miami lands in Kansas were worth $1.25 per acre in 1854 is supported by substantial evidence. The value of the 254,158.34 acres which were ceded was $317,697.93.
 
 
 22
 It must next be determined how much the Miami received in 1854 for the cession.
 
 
 23
 The Commission erred as a matter of law when it concluded that the Miami Tribe received $200,000. It is true that the treaty described the consideration as $200,000, but the treaty also prescribed the method of payment. The value of consideration received, as well as the value of land ceded, must be determined as of the date of cession. The payment of $50,000 to be held at interest had a treaty-date cash value of $50,000. But $150,000 payable in twenty yearly installments of $7,500 commencing six years after the treaty date had a treaty-date value of only $71,974.23, which was the then present value of the right to receive such payments, on standard annuity tables, computed at a 5% interest rate. The treaty-date value of the consideration which the Miami Tribe received was therefore $50,000 plus $71,974.23, or $121,974.23.
 
 
 24
 The Government argues that to so hold would be contrary to what this court said in its opinion in the earlier case of Miami Tribe of Oklahoma v. United States, supra, Ct.Cl., 175 F.Supp. 926, 955-956, slip opinion pp. 47-48, to the effect that the payments on account of a limited annuity which had been allowed as payments on the claim in Quapaw Tribe of Indians v. United States, 1 Ind.Cl.Comm. 644, 652, affirmed in part and reversed in part, 120 F.Supp. 283, 128 Ct.Cl. 45, were "probably installments of a stated purchase price and as such, to the extent actually paid, represented the consideration for the cession and payments on the claim." That statement was made when the court did not have the issue before it, and does not have the force of a holding. After considering the question as it is presented in this case, we cannot say that the receipt of an undertaking to pay $7,500 a year for 20 years starting in six years amounts to a payment of $150,000. If the Indians were in the position of selling such an undertaking, the Government would be the first to point out that it was worth only its capitalized value. In fact, this is the very argument which the Government presents in this case in urging that its payment for the 1854 commutation of the Miami's annuities was adequate.
 
 
 25
 The Miami received $121,974.23 for land which the Commission found to be worth $317,697.93. This is unconscionable consideration. It is only 38% of the value of the land. It is true that there is no exact dividing line between what is unconscionable and what is not. The disparity between the price paid and the fair market value of the land must be very great. We think that the Commission was correct when it said in this case that payment of less than half the true value in unconscionable. The Miami are thus entitled to recover for the value of their land ($317,697.93), less the payment they received ($121,974.23), which difference is $195,723.70.
 
 
 26
 (2) Whether the Miami Should Have Been Paid for 500,000 Acres in Kansas.
 
 
 27
 The Miami claim that they should recover also for the difference between 500,000 acres, the number of acres in Kansas which they claim they were promised when they agreed to move west, and 324,796.88 acres, the amount of Kansas land they actually received. We cannot find any promise that the Miami would be given 500,000 acres in Kansas.
 
 
 28
 In 1833, when the Miami reservations in Indiana still included almost 1,000,000 acres, Government representatives told the Indians that the President was willing to give them, in exchange for their Indiana lands, as much land west of the Mississippi as they then had in Indiana. The Miami informed the Government representatives that they did not want to give up their reservation, and no agreement was reached.
 
 
 29
 Again in 1834 the Government attempted to obtain a cession of the Indiana lands, but the Secretary of War directed the Miami agent to offer only 300,000 acres in the west, and to give 800,000 acres only "in the last resort * * * if nothing short will satisfy them." By a treaty signed October 23, 1834, 7 Stat. 458, the Miami ceded 250,560 acres of their Indiana land, for a recited consideration of $208,000 but there was no provision made for land in the west.
 
 
 30
 It was in Article 10 of the treaty of November 6, 1838, 7 Stat. 569, by which treaty the Miami ceded more than 200,000 acres for a recited consideration of $335,680, that the United States first agreed to possess the Miami with land west of the Mississippi. That Article provided:
 
 
 31
 "* * * the said country shall be sufficient in extent, and suited to their wants and condition and be in a region contiguous to that in the occupation of the tribes which emigrated from the States of Ohio and Indiana * * *."
 
 
 32
 No mention is made of 500,000 acres, or of a number of acres equal to those given up in Indiana. No western lands were given to the Miami under this treaty, but negotiations between the Government's Indian Agents and the Miami continued.
 
 
 33
 On November 28, 1840, Government representatives and the Miami concluded a treaty at the Forks of the Wabash, in Indiana, whereby the Miami ceded their remaining Indiana lands, about 491,000 acres, for a recited consideration of $550,000. 7 Stat. 582. Article 8 provided:
 
 
 34
 "It is hereby stipulated, that the Miami tribe of Indians shall remove to the country assigned them west of the Mississippi, within five years from this date; * * *."
 
 
 35
 When the treaty was submitted to the Senate for ratification, it was amended, on February 25, 1841, by the addition of an Article 12, which read:
 
 
 36
 "The United States hereby stipulate to set apart and assign to the Miamies, for their occupancy west of the Mississippi, a tract of country bounded on the east by the State of Missouri, on the north by the country of the Weas and Kaskaskias, on the west by the Pottawatomies of Indiana, and on the south by the land assigned to the New York Indians estimated to contain five hundred thousand acres." 7 Stat. 585.
 
 
 37
 The Miami subsequently, on May 15, 1841, assented to the amendment. 7 Stat. 585.
 
 
 38
 We cannot find, nor are we cited to, any evidence that the Government had promised to give the Miami land in Kansas equal in extent to the land they gave up in Indiana. What was promised was described in the 1838 treaty as country "sufficient in extent, and suited to their wants and condition."
 
 
 39
 There is a letter, dated May 29, 1854, from some Miami representatives to Commissioner Manypenny, where the Indians state:
 
 
 40
 "We were promised previous to our removal from Indiana, at the formation of our last treaty, a country west of large extent equal if not greater in quantity to the amount we disposed of, which was some ½ million of acres. We were promised a country sufficient in extent to keep off at a distance the bordering and predatory tribes. We are fully of the opinion that these promises and pledges on the part of our Great Father was remembered when the estimated number of acres were designated in, the amendment and ratification of our last treaty. They gave us the precise number of acres we sold in Indiana. We were promised a more extensive country, but an equal amount seemed to be the amount decided on by Congress. Their manner of designating the boundaries, not knowing the locality of the lands of the bordering tribes, is the cause of the unintentional deficiency of the stipulated treaty."
 
 
 41
 We do not think that the language of the 1840 treaty amounted to an engagement to assign to the Miami anything more than the area which was therein described by its boundaries. The mention of the estimated acreage was no more than it appears to be, a guess as to the size of the area which was to be assigned to the Indians.
 
 
 42
 Since, therefore, there was no promise to give the Indians 500,000 acres in Kansas, there was no shortage of acreage in the Kansas lands, and the Miami are not entitled to recover for the alleged shortage.
 
 
 43
 (3) The Commutation of Annuities.
 
 
 44
 We next consider the commutation of the Miami annuities which took place under the 1854 treaty. We think that the consideration which the Miami received for the commutation of the annuities which the Government was obligated to pay was inadequate. The annuities due the Miami in 1854 totaled $26,540 per year. It is agreed that the present cash value of a permanent annuity of $26,540, based on an interest rate of 5%, is $530,800. The Government contends, and the Indian Claims Commission agreed, that the Miami annuity of $25,000 under the treaty of October 23, 1826, 7 Stat. 300, was not a permanent annuity since it is provided for in the treaty as follows:
 
 
 45
 "* * * a permanent annuity of twenty-five thousand dollars shall be paid to them (the Miamis), as long as they exist together as a tribe; which several sums are to include the annuities due by preceding treaties to the said tribe."
 
 
 46
 We think that such an annuity has the value of a permanent annuity. The Government asserts that, because Congress might have been justified in declaring the tribal existence of the Miami terminated in 1873, the annuity's value in 1854 was that of a twenty-year annuity. It is hardly conceivable that the United States had the power, by its unilateral act, in effect to nullify this annuity. As for the tribe dissolving itself, it would not be expected that this relatively small band of Indians would purposely disable themselves from receiving their annuity. It was the policy of the United States at this time to encourage the assimilation of the Indians into the society, and this policy would hardly have been served by a provision which would end Indians' annuities upon their taking a step toward assimilation. The provision that the annuity, although permanent, be paid to the tribe as long as it existed together as a tribe presents a problem.
 
 
 47
 We must seek to give this treaty provision a meaning which will give effect to all of its language. "It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions if that be practicable." Geofroy v. Riggs, 133 U.S. 258, 270, 10 S.Ct. 295, 298, 33 L.Ed. 642. "Now, it is the duty of courts of justice so to construe all statutes as to give full effect to all the words in their ordinary sense, if this can properly be done; and thus to preserve the harmony of all the provisions." Bend v. Hoyt, 13 Pet. 263, 272, 10 L.Ed. 154. All words of a statute are to be taken into account and given effect if that can be done consistently with the plainly disclosed legislative intent. McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164.
 
 
 48
 In order to give effect to the words "permanent annuity," the specification that payments be made to the tribe as long as it remained together as a tribe must be interpreted as a specification of the proper party to receive the annuity rather than a limitation on its length. That is, the annuity was permanent, payable to the tribe so long as it existed together as a tribe, and payable thereafter to the various individual Miami.
 
 
 49
 This interpretation is strengthened by the fact that the various annuities which were consolidated by the 1826 treaty had been described as "permanent" (treaties of August 21, 1805, 7 Stat. 91; September 30, 1809, 7 Stat. 113 and 115), "perpetual" (treaty of October 6, 1818, 7 Stat. 189, 191), and "forever" (treaty of August 3, 1795, 7 Stat. 49, 51). Also, the 1854 treaty described the annuity simply as "permanent." 10 Stat. 1096. We find, therefore, that the value of the annuities to which the Miami were entitled in 1854 was the value of a permanent annuity of $26,400, or $530,800.
 
 
 50
 We must next determine how much the Miami received for the commutation of these annuities. Article 4 of the 1854 treaty provided that a payment of $421,438.68 be made, $190,434.68 to the Western Miami and $231,004 to the Indiana Miami. However, the Miami were not to receive payments having a present value of $421,438.68. The Indiana Miami's $231,004 was to be invested for them at 5% starting July 1, 1855, which was one year and one month after the treaty date. The treaty date value of such delayed investment was $219,804.59.
 
 
 51
 Of the $190,434.68 payable to the Western Miami, only $31,739.11 was paid in 1854. The rest was payable in five annual installments of $31,739.11, without interest. The present value in 1854 of the installments was $137,411.30, plus the $31,739.11 actually paid in 1854, or a total of $169,150.41.
 
 
 52
 Annuity installments of $25,000 were also paid in 1854 and 1855. The 1854 payment had already been earned, however, and the 1854 value of the 1855 payment was only $23,708.50.
 
 
 53
 The total 1854 value received by the Miami for commutation of an annuity worth $530,800 was therefore $219,804.59, plus $169,150.41, plus $23,708.50, or a total of $412,663.50. This amount is approximately 78% of the annuity's value. The issue then is whether the payment to the Miami of only 78% of the value of their annuity constitutes unconscionable consideration or is inconsistent with the requirements of fair and honorable dealings.
 
 
 54
 The Government admits that the Miami were entitled to the annuity, and points to no factor which might have induced them to take less than the annuity was worth. The commutation was apparently done at the insistence of the United States. During the negotiations which took place in Washington, D. C., between George W. Manypenny, the Commissioner of Indian Affairs, and the Miami delegation, from May 23 to June 7, 1854, Commissioner Manypenny stated that the Government wanted to "blot out" the old annuities by making several large payments. One of the Miami delegates answered that his party did not want it that way, but wished the annuities to run on. We find no evidence that the Miami wanted the annuities commuted. Under such circumstances, we can think of no reason for their having taken less than the value of their annuities other than that they were less than completely aware of the meaning and methods of commutation, and were incapable of determining for themselves the value of the annuity. Under such circumstances, we think that payment of less than the true value of the annuities which the Miami were entitled to receive amounted to something less than fair and honorable dealings, and that the Miami are entitled to recover the difference between $530,800 (the value of their annuities) and $412,663.50 (the amount they actually received for the commutation of their annuities), which is $118,136.50.
 
 
 55
 It is conceded that the Indiana Miami are entitled to share with the Miami Tribe in this recovery, in the same proportions as their respective payments for the commutation as provided in the treaty. For the purpose of computing the proportion, we will use the figures as recited in the treaty, rather than the present values of the respective payments, since we think the recited figures are more likely to indicate the fractions into which the payment was intended to be split. The Indiana Miami are thus entitled to 54.8% of the recovery, which is $64,738.80, and the Miami Tribe are entitled to $53,397.70.
 
 
 56
 (4) Claim for Interest on Misappropriated Funds.
 
 
 57
 A rider to the Appropriation Act of June 12, 1858, 11 Stat. 329, 332, provided that Miami annuities be paid to persons "of Miami blood" who had been excluded from annuities since 1846 and who were not included in the list of Miami compiled under the 1854 treaty. These persons were to be added to the list of Miami and be allotted 200 acres each in the Kansas reservation. Seventy-three persons were added to the Miami list under this Act, and they were given lands and annuities. It was later found that these persons were not members of the tribe, nor entitled to share in its funds. In 1891 Congress determined that, under this Act, the United States had taken from the Miami Tribe without their consent the sum of $18,370.89 in October 1858, and lands worth $43,600.14 in November 1859, and it therefore appropriated these sums for the Miami Tribe, without interest. 26 Stat. 1000. The Miami Tribe here claim interest on these sums.
 
 
 58
 It is, of course, well established that interest against the United States cannot be recovered in the absence of express statutory or contractual provisions therefor, United States v. Alcea Bank of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738; United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588, 67 S.Ct. 398, 91 L.Ed. 521, except when there is a taking which entitled a claimant to just compensation under the Fifth Amendment. United States v. Alcea Bank of Tillamooks, 341 U.S. at page 49, 71 S.Ct. at page 553; Seaboard Air Line R. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664.
 
 
 59
 The Miami Tribe argue here that the misappropriation of funds was a taking, for which, under the Fifth Amendment, they were entitled to receive interest as well as the principal.
 
 
 60
 The allotment by the Government or its agents of property rightfully belonging to an Indian tribe to some other party is a taking of that property for which the Indians are entitled to receive just compensation, which includes the payment of interest. Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360; United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331.
 
 
 61
 But the Government says there was no "permanent appropriation of property for public purposes," as there was in the Shoshone case. What happened in Shoshone was that the Government had brought a band of Northern Arapahoe to the reservation of the Shoshone under military escort in 1878. No cession or "permanent appropriation" was made to the Arapahoe at that time, yet the Supreme Court held that the Shoshone were entitled to receive just compensation for the value of their property which had been "taken" in 1878. There was no less a taking here when the Government gave to persons other than Miami Indians property which rightfully belonged to the Miami.
 
 
 62
 Any failure to fully set forth this claim for interest in its pleadings before the Commission was remedied by the clear statement of the claim by counsel for the Miami Tribe at the beginning of the trial.[1] The Commission's own Rule of Procedure 13(b) provides:
 
 
 63
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made by motion of any party at any time, even after judgment; but failure to so amend does not affect the trial of these issues."
 
 
 64
 The Miami Tribe is therefore entitled to recover interest at the rate of 5% on the $18,370.89 from 1858 to 1891, and on the $43,600.14 from 1859 to 1891. This amounts to $100,072.19.
 
 
 65
 (5) Whether the Indiana Miami Are Entitled to Share in the Recovery for the Kansas Land.
 
 
 66
 The Indiana Miami claim that they should have shared in the payment which was made for the Kansas lands in 1854, and in the recovery granted in this proceeding of additional compensation for those lands. They argue that because they had been given permission by the tribe and by the United States to remain in Indiana, they could not and did not lose their membership in the tribe, and that since they remained members of the tribe they were and their descendants are entitled to share in the proceeds of the tribal lands.
 
 
 67
 The Indian Claims Commission found that the Indiana Miami who had remained in or who returned to Indiana without tribal consent had separated themselves from the tribe, severed their tribal relationship, and lost all right to participate in the tribal assets, funds or property. This conclusion is correct. Eastern Band of Cherokee Indians v. United States, 117 U.S. 288, 309-312, 6 S.Ct. 718, 29 L.Ed. 880; Prairie Band of Potawatomi Indians v. United States, Appeal No. 2-57, decided July 16, 1958, 165 F.Supp. 139, 143 Ct.Cl. ___ (slip opinion, pp. 12 and 20).
 
 
 68
 The Commission further found that these Miami united with the Miami who had tribal permission to remain in Indiana, and that this united group, by participating in and approving the treaty of 1854, recognized and agreed to a division of the tribal assets in which they accepted certain money, benefits and consideration and waived their claims to other tribal assets, including the Kansas lands. The appellant Indiana Miami dispute this conclusion, on the grounds that the representatives of the Indiana Miami who participated in making the treaty were not authorized to cede the Kansas land. We think that there is evidence that the Indiana Miami acquiesced in the cession as made. Although their representatives present at the treaty negotiations, and at the signing on June 4, 1854, may not have been authorized to cede the land, after the treaty had been signed a full council of the Indiana Miami was called and a delegation dispatched to Washington, D. C., to secure an amendment to the treaty provision relating to the method of payment for the commutation of annuities, in which they were to share. The entire treaty, including the provision that the Indiana Miami were to have no share in the payments for the Kansas land, implying that they had no interest therein, was before the Indiana Miami council at that time, and they made no objection to the land cession or to the implication of their lack of any interest in those lands. We conclude therefore that the Commission was correct in its conclusion that the Indiana Miami are not entitled to share in the recovery for the Kansas lands.
 
 
 69
 Conclusion.
 
 
 70
 The judgment of the Indian Claims Commission is reversed. The Miami Tribe of Oklahoma (petitioners in Docket No. 251 before the Indian Claims Commission) are entitled to recover $195,723.70 as additional compensation for the Kansas land which was ceded to the United States in 1854, $53,397.70 as additional compensation for the annuities which were commuted by the treaty of 1854, and $100,072.19 as interest on the sums due them as a result of the misappropriations of 1858 and 1859. The total recovery will be $349,193.59. The Indiana Miami (petitioners in Docket No. 124-A before the Indian Claims Commission) are entitled to recover $64,738.80 as additional compensation for their share of the annuities which were commuted in 1854. These cases are therefore remanded to the Indian Claims Commission for the entry of an order in accordance with these conclusions.
 
 
 71
 It is so ordered.
 
 
 72
 LITTLETON, Judge (Retired), and LARAMORE, Judge, concur.
 
 
 
 Notes:
 
 
 [1]
 "Now, there is still another claim that we have * * * and this again is solely a western Miami claim * * *
 "In the year 1858 * * * the payment of annuities and the granting of land was authorized to certain people who were supposed to be Miamis and who, the evidence shows, were never Miami Indians at all. * * *
 "[T]his was clearly a taking under the Constitution. It fulfills every requirement of a taking under the Fifth Amendment. * * *
 "So the claim of interest from 1858 to 1891 * * *"
 "Mr. Miller (for defendant): Could I ask a question there? * * * Is the only thing you are claiming there, which I have down as Issue 4 and which you are speaking of, the contention of interest on the amount that has been previously awarded from 1858?"
 "Mr. Rothschild (for petitioners): That is correct, sir."
 
 
 
 73
 WHITAKER, Judge (dissenting).
 
 
 74
 This case is brought under the Indian Claims Commission Act on the ground that various acts of the Government in its dealings with the Indians were unconscionable or inconsistent with fair and honorable dealings. We said in Sioux Tribe of Indians, et al. v. United States, Ct.Cl., 146 F.Supp. 229, 234, that an unconscionable consideration "is that consideration which is so much less than the actual value of the property sold that the disparity shocks the conscience, Osage Nation of Indians v. United States, 1951, 97 F.Supp. 381, 119 Ct.Cl. 592, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672."
 
 
 75
 I do not think that the consideration paid the tribe under the 1854 treaty was so inadequate as to shock the conscience.
 
 
 76
 The Commission finds that the value of these lands was $1.25 an acre, but some of the Government's witnesses testified to a considerably lower value; one of them testified to 35 cents an acre, and another one to 50 cents an acre. Lands in that western country at the time of the 1854 treaty had a very uncertain value. It was difficult then, and it is much more difficult now, to determine with any degree of accuracy what those lands really were worth. The majority opinion says that what was paid the Indians was less than 50 percent of their value at $1.25 an acre, but what was paid them was more than their value according to the testimony of both of the Government's appraisers. Under such circumstances, I cannot say that my conscience is shocked at the amount the Government paid.
 
 
 77
 I am more firmly of this opinion with reference to the commutation of annuities. A mistake may have been made in the commutation of these annuities, or there may have been no effort to compute them with accuracy, but the amount paid is by no means so out of line with the amount the court now finds their value to be, by meticulous computation, as to shock my conscience or to amount to conduct that was less than fair and honorable.
 
 
 78
 JONES, Chief Judge, joins me in the foregoing dissent.