The SAC AND FOX TRIBE OF INDIANS OF OKLAHOMA et al., Appellants,

v.

The UNITED STATES, Appellee.

No. 3-63.

United States Court of Claims.

Oct. 16, 1964.

Guenther M. Philipp, Chicago, Ill., for appellants. George B. Pletsch; Dallstream, Schiff, Hardin, Waite & Dorschel, Chicago, Ill., of counsel.

Walter J. Muir, Washington, D. C., with whom was Asst. Atty. Gen., Ramsey Clark, for appellee.

Before JONES, Senior Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE, and DAVIS, Judges.

DURFEE, Judge.

The Sac and Fox Tribe of Indians of Oklahoma appeal from a decision by the Indian Claims Commission [1] that the price paid to them in 1891 by the United States for surplus unallotted reservation lands was not unconscionable.

In 1867 the appellants, by treaty,[2] acquired a new Indian reservation situated in the Indian Territory near the center of the present State of Oklahoma, consisting of about 480,000 acres, being a rectangle about 43 miles long from north to south, and 17 miles wide from east to west. In 1889 Congress authorized [3] the creation of a Commission to negotiate an agreement with the Oklahoma Sac and Fox and other tribes in this general area for the purchase of their lands for white settlement. This was done by the Jerome Commission and appellants in 1890. Under the agreement,[4] each citizen of the tribe would be entitled to select an individual allotment of 160 acres anywhere in the reservation not previously reserved for tribal purposes. Five hundred forty-eight of such individual allotments were made, embracing some 87,680 acres. The remaining net acreage ceded to the United States was 391,188.05 acres. This unallotted acreage, which we will refer to as the surplus lands, was sold by the Sac and Fox Tribe to the Government at a price set by the Jerome Commission of $1.23 per acre, and was then made available for white settlement under the homestead laws. The appellants argue that the 1891 value of these lands was in excess of $7.00 an acre.

The Indian Claims Commission has valued these surplus lands as of February 13, 1891, the effective date of ratification of the 1890 agreement. The Commission has found that this payment of $1.23 per acre for the surplus lands, as well as the right of the Indians to take their individual 160-acre allotments anywhere on their reservation, was the result of fair and open negotiations between the tribal governing council and the Jerome Commission. It has also found no evidence of any conduct by the United States representatives in these transactions that would indicate that the Indians were dealt with in an unfair and dishonorable manner. The Commission concluded that as of February 13, 1891, these surplus lands had an overall fair market value not in excess of $1.75 per acre. Among the factors stated by the Commission in arriving at this conclusion were:

"* * * the location of the area, its physical characteristics, climate, timber, development of surrounding areas, markets, transportation, as well as the private sales of small improved tracts within and without the tract, and the general economic outlook * * *." [11 Ind.Cl. Comm. 608, 626.]

The Commission also concluded that the consideration of $1.23 per acre actually paid by the United States to the tribe, although to a degree inadequate, was not unconscionable within the meaning of section 2 of the Indian Claims Commission Act, and that the tribe was not entitled to recover.

Appellants urge that in reaching this determination of the 1891 market value of the surplus lands, the Commission rejected or refused to accord any probative weight to substantial evidence at to contemporaneous private sales of other tracts of land in the same area. These sales are alleged by appellants to be comparable in amount per acre to the value per acre of the surplus lands sold by them to the Government in 1891.

1. 11 Ind.Cl.Comm. 578, 608, Docket 220, Nov. 28, 1962.

2. Treaty of February 18, 1867, 15 Stat. 495.

3. Act of March 2, 1889, 25 Stat. 980.

4. Agreement of June 12, 1890, ratified Feb. 13, 1891, 26 Stat. 749.

The Commission, in its opinion, "agrees with the tribal claimants that it is impossible to determine with mathematical exactness the 1891 fair market value of the Sac and Fox lands." [11 Ind.Cl.Comm. 608, 622.] This impossibility of exact determination is a consequence of the evidentiary fact that there had been no private land sales in this tract of the Indian territory prior to, or contemporaneous with, its 1891 cession by the Sac and Fox to the Government. Accordingly, we must determine whether the Commission properly considered the best evidence otherwise available in determining fair market value. Although fair market value found in one case or in one area cannot solely control the determination of fair market value in another area or another case as a precedent, the absence here of any evidence of any private sales market for the Sac and Fox lands in Oklahoma at the time of the cession in 1891, compels a careful examination of other contemporaneous and comparable private sales or appraisals of lands in the surrounding area, as one of the factors considered by the Commission. Obviously, the Commission gave little or no weight to the evidence offered by appellants as to this particular factor in the determination of value.

The effect of this evidence was well considered in Commissioner Scott's dissent in this case:

"It cannot be supported, and I would not contend that a fair market value found in one case becomes a controlling precedent for another case. *However, since no private sales market in fact existed for such Indian lands on the date of the cession herein,* it is my opinion we should follow the well settled practice in such cases of considering evidence of such private sales as appear to be of probative value in determining the issue of fair market value. In other words, the Commission should look to the best evidence available to assist the Commission in determining market value of Indian lands (Kiowa, Comanche and Apache

Tribes v. U. S., 4 Ind.Cl.Comm. 96; Choctaw and Chickasaw v. U. S., 1 Ind.Cl.Comm. 291, 326) and the Commission should to a large extent examine transactions involving comparable land sales in or near the area near the time at which the value must be determined. (Quapaw v. U. S., 1 Ind.Cl.Comm. 469, 500)." [11 Ind. Cl.Comm. 608, 633.] [Emphasis supplied.]

Consideration of comparable private sales in and near the subject lands has been approved by this court, particularly in the absence of any private sales market for the subject lands in a number of cases. Alcea Band of Tillamooks v. United States, (1950), 87 F.Supp. 938, 947, 115 Ct.Cl. 463, 505, reversed as to interest, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738; Rogue River Tribe of Indians v. United States, (1950), 89 F. Supp. 798, 803, 116 Ct.Cl. 454, 478, cert. denied 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342; Otoe and Missouria Tribe of Indians v. United States, (1955), 131 F.Supp. 265, 290, 131 Ct.Cl. 593, 633, appellee's petition for cert. denied 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755; Miami Tribe of Oklahoma v. United States, (1960), 281 F.2d 202, 207, 150 Ct.Cl. 725, 733, cert. denied 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383.

The evidence of private sales of comparable, undeveloped lands in a nearby area (Canadian County) as summarized by the Commission, showed that prices in recorded private transactions in that area ranged from about an average of $4.19 per acre in 1890 to $8.74 per acre in 1892.

In private transactions between 1890 and 1891 involving tracts of improved land of 40 acres or more, totaling 108,-576.40 acres of lands allotted to individual Indians and situated within the subject land area in Lincoln and Payne Counties, the average sales price per acre was $7.85.

The value of all lands in the Oklahoma Territory as estimated in the United States Census report for the year 1890,

exclusive of buildings, was $5.34 per acre.

Indian allottees on the Pottawatomie and Absentee Shawnee lands adjoining the subject lands were permitted to sell portions of their allotments totaling 16,411 acres in 1891, subject to approval by the Secretary of the Interior. Following 121 of such sales at an average price of $3.55 per acre, the Secretary withheld his approval, and instructed the special Indian agent for the area to determine the true value of each tract. The overall valuation of the 16,411 acres by this agent of the Government in 1894 was $8.97 per acre. The Commission's opinion "finds it difficult to give much weight to Agent Shelby's appraisals in the absence of other evidence of value with respect to the lands. The Commission has no way of determining Agent Shelby's qualifications as a land appraiser." [11 Ind.Cl.Comm. 608, 621.]

Pursuant to the express direction of the Commissioner of Indian Affairs to "arrive at the just and true value of each tract" [Letter, November 26, 1894, from Commissioner of Indian Affairs to Agent Shelby; National Archives, Record Group 75], this official appraiser submitted a report which clearly indicates that he made a careful, thorough and competent study and appraisal of the Pottawatomie and Absentee Shawnee lands, including a determination of market values, based upon current private sales by white settlers in the area. He inspected each of the 126 tracts (except two), and separately estimated their market value. His overall valuation was $8.97 per acre for lands which the Commission here found were "generally comparable to the Sac and Fox lands." (Finding 42.)

As to this evidence, the Commission concluded:

" * * * The Commission finds it difficult to give much weight to Agent Shelby's appraisals in the absence of other evidence of value with respect to the same lands. The Commission has no way of determining Agent Shelby's qualifications as a

land appraiser. His appraisal figures cannot properly be tested, and they stand uncontroverted. * * " [11 Ind.Cl.Comm. 608, 621.]

We are disposed to give this appraisal much greater weight than the Commission did. The selection of the special Indian agent as official appraiser by the Secretary of Interior is, of itself, substantial evidence of his qualifications, particularly in the absence of any evidence challenging his appraisal. While we do not accept $8.97 per acre or any other figure as conclusive, we regard this evidence of contemporaneous market value of comparable adjoining lands as being competent and probative.

The subject lands were separated on the northwest corner by less than fifteen miles from the lands of the Cherokee Outlet, which the Indians Claims Commission recently found had a fair market value as of March 3, 1893 at an average price of $3.75 per acre. The Cherokee Nation v. United States, 9 Ind.Cl.Comm. 162, 233. The Jerome Commission, in reporting its 1890 negotiations with the Sac and Fox to the President, stated:

"The Sac and Fox Reservation contains 479,668 acres of land, *and is said to be better land on the whole than the Cherokee Outlet.*" [Emphasis supplied.] [Letter, June 12, 1890 from Jerome Commissioners to the President, Senate Executive Document 172, 51st Cong. 1st Sess.]

The only direct specific evidence offered by the Government as to fair market value was the testimony of two real estate appraisers who concluded that the Sac and Fox surplus lands had an 1890 fair market value of $.40 per acre. Apart from including this evidence in the findings, the Commission, in considering this particular appraisal, concluded that "the evidence does in fact support a higher value," which it placed at not to exceed $1.75 per acre.

Obviously, the Commission gave little or no weight to any of the evidence offered by the appellants as to private sales of tracts within and without the subject

area, at an average figure of over $7.00 per acre. It is equally apparent that it gave no weight to the testimony of the Government's witnesses that the value was 40 cents per acre.

The Commission characterized all of this evidence as to comparable contemporaneous sales within and nearby the Sac and Fox territory as being either "interesting but of little probative value," "judicially unacceptable," "difficult to give much weight to" or "inconsequential" in probative value.

Although we agree with the Commission that "it is impossible to determine with mathematical exactness the 1891 fair market value of the Sac and Fox lands," it is also impossible for us to determine how the Commission arrived at its finding that the lands were "worth no more than $1.75 per acre." It stated no formula rationale or evidentiary basis for this determination, other than the general statement of factors it considered and hereinabove quoted.

In addition to the general factors as to value stated by the Commission, it is apparent that a more specific factor was the value of the improvements, as to which the Commission found:

"It is not possible to determine the extent, quality and value of the improvements." [11 Ind.Cl.Comm. 578, 601.]

" * * * There is no separate evaluation of the farm improvements, and from the data given there is no way to make such a determination." [11 Ind.Cl.Comm. 578, 602.]

The Commission commented on the evidence offered by the appellants as to value of improvements:

"In order to establish a hypothetical per acre price for the Sac and Fox lands for the year 1890, the claimants made dubious application of the Wholesale Price Index for all commodities for the period 1890–1910. They concluded that the market value for improved Sac and Fox lands in 1890 was slightly in excess of $8.00 per acre.

"In determining the separate value of improvements as a necessary deduction from the $8.00 per acre figure, the claimants relied upon data taken from the Twelfth Census of 1900 wherein it purportedly shows that Lincoln County farmland including improvements, other than buildings, amounting to 578,387 acres, had a per acre evaluation of $8.69. Because this census figure was approximately $0.77 per acre less than the average per acre price of all lands actually sold in Lincoln County in 1900, the difference necessarily represents the per acre value of all building improvements, and that $0.75 would be a conservatively estimated average value for building improvements for the nine year period 1892–1900. Therefore, $8.00 less $0.75 for improvements, less $0.06 for survey costs, means that in 1890 the raw and unimproved Sac and Fox lands had a fair market value of $7.19 per acre.

"The petitioner's calculations and computations in this regard are interesting but of little probative value in convincing this Commision that subject lands were worth that much to a prospective 1891 purchaser." [11 Ind.Cl.Comm. 608, 618, 619.]

However, there is substantial corroboration for this calculation of the value of the improvements at 75 cents per acre for the 1892–1900 period, within the subject tract in Lincoln County. During this period, sales of the lands allotted to the Indians were permitted by the Secretary of the Interior only after an official appraisal. Fifteen of such appraisals made between 1900 and 1910, when prices were generally higher, and of lands generally better than the surplus lands, fixed the value of all improvements at an average of 86 cents per acre, or 4.41 percent of the total appraised value of the improved tracts. This substantial evidence as to the relatively small percentage of total value due to improvements was apparently ignored completely

by the Commission, there being no mention of it in the opinion.

There is also the testimony of a competent, expert witness, Dr. McReynolds, whose first-hand knowledge of the facts provided an accurate account of the value of the improvements:

"* * * and the homesteader, having to rely upon makeshift tools and few implements and very few horses, would make rather flimsy improvements. I know for a fact that many of the houses built were of very little value so far as money value was concerned." [Transcript of testimony before Indian Claims Commission, Docket 220, p. 72, April 29, 1958.]

The Commission made no findings as to this testimony, which was competent, relevant and uncontradicted. The value of homemade improvements by early settlers between 1890 and 1900 by building log cabins and split rail fences cannot account for the wide disparity between the average sales price of $7.85 per acre for the allotted lands within the Sac and Fox area, and $1.23 paid for the surplus unallotted lands within the same area. This wide disparity in value cannot be accounted for by any evidence of the value of improvements on the lands sold at private sale. Although it is not possible to determine their value, there is substantial evidence that this value was relatively small.

We conclude that the Commission erred in disregarding substantial evidence offered by appellants as to private contemporaneous and comparable sales of lands within and adjacent to the subject tract. We further find that, particularly in the absence of any evidence of any sales of the subject lands in 1891, the Commission erred in rejecting substantial and uncontroverted evidence offered by appellants as to the relatively small value of improvements on the other lands sold at private sale between 1890 and 1900.

As to the other factors considered by the Commission such as "the location of the area, its physical characteristics, climate, timber, development of surrounding areas, markets and transportation," we find no substantial evidence of any marked difference or inferiority between the Sac and Fox lands and the adjoining lands.

For example, we have referred to contemporaneous 1891 sales of 16,411.97 acres of the adjacent Pottawatomie and Absentee Shawnee lands for $3.55 per acre which were set aside by the Secretary of the Interior in 1894 and appraised by his official agent at an overall fair market value of $8.97 per acre. These same lands have been found by the Commission to have been "generally comparable" to the Sac and Fox lands.

As to the nearby Cherokee Outlet lands for which the Commission recently established a fair market value of $8.75 per acre, the Jerome Commission in expressing its satisfaction to the President in 1891 at having negotiated the Sac and Fox price of $1.23 per acre, stated that the Sac and Fox tract "is said to be better land on the whole than the Cherokee Outlet." [Letter of June 12, 1890—Jerome Commissioners to the President, Senate Executive Document 172, 51st Cong. 1st Sess.]

The Commission has found the Sac and Fox lands generally to be rolling upland, an abundance of open prairie, fairly well timbered, fertile and productive soil, with adequate rainfall (34 inches a year) and that ordinarily the temperature in the area did not run to extremes. Except for few primitive Indian improvements of little or no value to the settler, the land was virgin country. There is no finding that this land was inferior in physical characteristics to the adjoining territory.

As to the market for the subject lands, Commissioner Scott in his dissenting opinion pointed out:

"It is a well known and undisputed historical fact that the settlers' demands for subject lands was of such tremendous proportions that every acre was taken by homesteaders in a matter of hours after the opening run." [11 Ind.Cl.Comm. 608, 636.]

Despite this tremendous demand, the Commission has emphasized the fact that the average homesteader on the Sac and Fox surplus land "made little use of his commutation privileges," [11 Ind.Cl. Comm. 608, 620], since only 31 percent of these lands was ever paid for and patented at $1.25 per acre, either after commutation, or after the expiration of the five-year residency requirement. The Commission reasoned that if a 160-acre Sac and Fox tract was worth $1,150 in 1890, a homesteader could have profited handsomely by commuting his property and putting it up for sale. This conclusion, is, to say the least, speculative. The fact is that these settlers knew that there was a tremendous demand for their lands; that the territory was developing rapidly; that land values were steadily increasing; that nearby cities and a new territorial capitol were springing up overnight. They knew that Congress had created a new territorial Government and had authorized much new railroad construction through the territory; that new railroad construction nearby was in progress, and that the Santa Fe Railroad line was actually in operation only thirty miles from the reservation.

The national purpose of the Homestead Act was not to encourage speculation in land values in Oklahoma, but for homesteaders to develop the territory through their own efforts. The settler knew this, and he also knew that if he did not take advantage of his commutation privilege, his land remained free from taxes and exempt from judgments. It is just as reasonable to assume that these pioneer settlers were looking for homes and farms, and that they knew that their own homestead was worth more than $200, or more than $1,150 in 1891, as it is to accept the Commission's assumption that these settlers were land speculators who would have cashed in at the first opportunity by asserting their commutation privileges, and selling their property. These homesteaders could also sell their claim by relinquishment without paying for commutation of the homestead peri-od or paying for a patented title, an evidentiary fact apparently not considered by the Commission in this regard. We do not attach the same emphasis or importance to the 31 percent use of commutation privileges as was done by the Commission.

We therefore conclude that the Commission's ultimate conclusion that the fair market value of the surplus reservation lands was not in excess of $1.75 per acre, is based upon findings as to such value which are not sustained by substantial evidence in the record taken as a whole. Without accepting or specifying any specific figure as to the fair market value of the subject lands, it would appear from all the evidence of record that the entire unallotted tract was worth at least an average of $3.00 per acre at the time of the ratification of the agreement with the Sac and Fox tribes in 1891. We therefore conclude that the fair market value of the unallotted acreage should be determined by the Indian Claims Commission at not less than $3.00 per acre, or higher.

*Duress*

■ The Commission has found "that there is no evidence of over-reaching, sharp and fraudulent practices, or the withholding of information from the Indians by the Government respecting the true value of the subject lands, or any other conduct on the part of the United States representatives that would indicate that the Indians were dealt with in an unfair and dishonorable manner." [11 Ind.Cl.Comm. 578, 592.]

In 1889 and 1890 there was great political pressure on the Government to provide more land for white settlers. The result of this political pressure became apparent in the negotiations between the Jerome Commission and the Sac and Fox Tribes. Not only were the tribes told by the land commissioners that they must sell; they were admonished that they could sell only to the United States, and only when the United States was ready to buy; that they could not even lease or mortgage the lands. Finally, they were told by the Commission in

language of unmistakable import that $1.25 per acre was all they could get because that was all the Commission and the Congress would approve. They were even advised by one of the Commissioners that *"we have offered you more lands and made a better offer than the law provides for."* [Proceedings of the Jerome Commission, National Archives, Record Group 75, letters received 4738/1894, encl. 2.] The combined effect of all of these admonitions could only be interpreted as a flat ultimatum to the illiterate and unsophisticated representatives of the Sac and Fox that they had better take $1.25, "or else," in common parlance. The duress and compulsion exerted by the land commission becomes even more clear when we consider that the Indian Claims Commission has found that the $1.23 per acre that these Indians were compelled to accept was "inadequate."

Even if we assume that the negative characterization of the conduct of the Government by the Indian Claims Commission, as above quoted, is correct, the fact remains that this sale was negotiated by Government coercion and compulsion exerted upon appellants to such a degree as to constitute duress.

The Indian Claims Commission found duress under almost identical circumstances in the negotiations for the Government's purchase from the Cherokee Nation of comparable lands only fifteen miles away, and only eighteen months after the Sac and Fox negotiations of lands.

As pointed out in the able dissent by Commissioner Scott from the decision of the Commission herein, the Cherokee Indian representatives were able, astute and literate men, whereas the Sac and Fox Indian representatives were illiterate Indians who required interpreters. Although the majority opinion of the Commission in the present case does not refer to duress in its negative finding that there was no evidence of unfair or unconscionable dealings, we find the language used by the Indian Claims Commission in its Cherokee opinion, in characterizing the conduct of the land com-

missioners in that case, singularly applicable to the dealings of the land commissioners with the Sac and Fox:

" * * * Throughout the negotiations the government representatives insisted they could not exceed the offered price of $1.25 per acre set by Congress. The Cherokees became well aware of the constant clamor by the public and Congress for the opening of the lands to white settlement and the evident disposition of Congress to secure the lands with or without the consent of the petitioner. The Cherokee representatives under the circumstances tried diligently to bargain with respect to the purchase price but the United States Commissioners were adamant in insisting on $1.25 per acre. Although at the final meeting the Cherokees were successful in having the purchase price raised a few cents per acre the record is clear that there was no arm's length bargaining between the parties to the negotiation. The Cherokees were subject to duress in obtaining from them a cession of the subject tract." [The Cherokee Nation v. United States, 9 Ind.Cl.Comm. 162, 234–35.]

In defining the fiduciary obligation assumed by the Government toward Indian tribes in cases involving land sales, this court said:

" * * * A breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust. * * *" [United States v. Seminole Nation (1959), 173 F.Supp. 784, 789, 146 Ct.Cl. 171, 179.]

The Jerome Commission was certainly charged with this position of trust in dealing with the appellants. From all the circumstances attendant upon the negotiation of this agreement, we conclude that the coercion and duress exerted by the Government upon the appellants was so strong and overwhelming as to be "unfair" and the consideration of $1.23

per acre arrived at was "unconscionable," under sections 2(3) and 2(5) of the Indian Claims Commission Act, 60 Stat. 1049. We have already considered and decided that the Commission's ultimate conclusion, that the fair market value of the surplus reservation lands was not in excess of $1.75 per acre, is based upon findings which are not sustained by substantial evidence contained in the record taken as a whole.

Accordingly, the decision of the Indian Claims Commission is reversed and the case is remanded for further proceedings.

WHITAKER, Senior Judge (concurring in part and dissenting in part):

I agree that the amount paid for the land purchased from the Indians was so inadequate as to be unconscionable, but I cannot see that any duress was exercised in this case. The fact that the Commission told them that $1.25 per acre was all they could get because that was all it and Congress would approve, I do not think by itself constitutes duress. The Indians were perfectly free to reject the offer. So far as I know, the Jerome Commission never represented that they had to sell. So far as I can ascertain, they said no more than, that is all we are going to pay and if you do not accept it, then we can not make any deal with you. I do not think that this is duress.

Other than this, I concur in the opinion of the court.

Reversed and remanded.